**JOHNSON v. NEW YORK, N. H. & H. R. CO.**

No. 74, Docket 22134.

United States Court of Appeals
Second Circuit.

Argued Nov. 8, 1951.

Decided Feb. 4, 1952.

---

Edward R. Brumley, New York City, for appellant; Robert M. Peet, New York City, of counsel.

David M. Fink & Jacquin Frank, New York City, for appellee; Jacquin Frank, New York City, of counsel.

Before SWAN, Chief Judge, FRANK, Circuit Judge, and COXE, District Judge.

SWAN, Chief Judge.

This is an appeal by the defendant from a judgment for the plaintiff after trial to a jury in an action brought under the Jones Act, 46 U.S.C.A. § 688, to recover damages for the death of the plaintiff's intestate. The decedent was an experienced floatman employed on the defendant's tug "Transfer No. 10." He met his death by drowning on April 22, 1946 while the tug was removing two empty carfloats from defendant's Oak Point railroad yard on the East River. No eyewitness saw the accident, nor was the fact of the floatman's death known until after the tug had completed its maneuver. His body was later discovered floating in the slip close to the apron of Bridge 12. The questions raised by the appeal are (1) whether there was adequate proof of the defendant's negligence, and (2) whether, if negligence was proved, there was proof that such negligence caused the decedent's death. These questions were raised below by a motion for a directed verdict which the court reserved and denied with an opinion after the jury's verdict.

The carfloats which the tug removed from the Oak Point yard were numbered 53 and 58. Carfloat 53 was in Bridge 11 and carfloat 58 in Bridge 12; each was lying bow in and was 340 feet in length and 40 feet wide. Between the bridges was a pier about 50 feet long referred to in the testimony as the "short rack." On the outer sides of the bridges were longer piers referred to as "long racks." The floats were held in the bridges by rack lines. Testimony as to how the maneuver of removing the floats was performed was given by the master and mate of the tug. The captain put the bow of the tug against the port stern quarter of float 53, and the mate Gaglio then stepped aboard float 53 and went

toward its stern to secure the sterns of the floats with a line as soon as the tug had pushed them together. Having performed this duty, Gaglio returned to a place on the float near the tug to handle the tug's bow line. Johnson, the floatman, had followed Gaglio on to the 53 and when last seen alive was walking toward its bow. His duty was to release the short rack line in Bridge 11, go ashore and cross over to Bridge 12, get aboard float 58, release the short rack line in Bridge 12, and then shout "all gone" as a signal that the floats were ready to be moved. He was then to remain at the bow of the 58 in readiness to secure the bows of the two floats when they came together after being pulled clear of the short rack. From the tug's pilot house Capt. O'Brien saw that both rack lines in Bridge 11 and the long rack line in Bridge 12 were released. The short rack blocked vision of the short rack line in Bridge 12 to Capt. O'Brien and also to the mate. Both of them heard the shout "all gone" but each testified that he could not identify the voice as Johnson's because of the distance of the shouter. When Capt. O'Brien heard the signal shout "all gone," he sounded a long slip whistle and with engines reversed slowly pulled the floats out into the river. They came out without any trouble and it later appeared that in fact the short rack line in Bridge 12 had not rended; hence it must have been released. Capt. O'Brien's procedure on this occasion was the same as he had always followed during 19 years of service. When the tug was in the river clear of the long racks the captain first observed that Johnson was not on the bow of the 58. He asked Gaglio where Johnson was and the latter replied that he did not know. At no time while the floats were being moved was any splash or call for help heard or anything unusual observed. Johnson was known to be a good swimmer. When the captain discovered that Johnson was not on the 58, he ordered Gaglio to fasten the floats together at their bows and he then proceeded to his nearby destination at the Gates dock. As soon as the floats were tied up there, he brought the tug back to the Oak Point yard. He figured that to proceed to destination and return light would take less time than to place the floats

back in the bridges. As the light tug was approaching the yard, the captain blew a signal for Johnson to return to the tug; he then sent the mate ashore to look for him. Upon receiving Gaglio's report that Johnson could not be found, he ordered him to look around the float bridges. At Bridge 12 Gaglio discovered something floating in the water. He reported this to the captain and they both then went to Bridge 12 and hauled from the slip Johnson's body. Attempts to revive him by artificial respiration were unavailing. They saw no cuts, bruises or marks on the body, but Mrs. Johnson and her daughter testified that at the funeral parlor they noticed scrape marks on his forehead.

The only disputed testimony was given by expert witnesses. Holmes, a retired tug captain whose experience had been chiefly in handling carfloats for the Pennsylvania Railroad, was called as an expert witness by the plaintiff. He testified that the common custom and practice in New York Harbor required a tug captain before moving his floats after hearing the "all gone" signal, if he could not see the shouter and did not recognize his voice, to send a deckhand to see whether the man who released the last rack line was in a safe position. Capt. DeMars, who testified as an expert for the defendant, denied the existence of any such practice even as to Pennsylvania carfloats and stated that the common custom and practice in New York Harbor was to operate as Capt. O'Brien had done. The only issues submitted to the jury as to negligence were whether there existed a well-known custom and practice such as Capt. Holmes had described; whether, if such a custom did exist, the defendant violated it and whether the violation was the proximate cause of Johnson's death. The jury returned a verdict for the plaintiff.

The appellant contends that the testimony fails to prove the existence of any well-known custom and practice such as Captain Holmes described. He could and did testify as to his own practice during the many years he worked as a tug-boat captain for the Pennsylvania Railroad. But the practice of one railroad is not sufficient to prove a common custom and practice.

Petition of Highlands Nav. Corporation, 2 Cir., 29 F.2d 37, 38; Willis v. Pennsylvania R. Co., 2 Cir., 122 F.2d 248, 250, certiorari denied 314 U.S. 684, 62 S.Ct. 187, 86 L.Ed. 547. Captain Holmes' opportunities to observe what other railroads did under similar circumstances had been few and his testimony as to their practice is far from convincing. But the jury chose to believe it, and we are not prepared to hold that it is so inherently incredible as to permit this court to substitute its judgment for theirs. See Bailey v. Central Vermont Ry., 319 U.S. 350, 353–354, 63 S.Ct. 1062, 87 L.Ed. 1444; Shiffler v. Pennsylvania R. Co., 3 Cir., 176 F.2d 368, 369.

Even on the assumption that the custom existed and was violated, the judgment can be supported only if the evidence justified a finding that the violation had a causal relation to Johnson's death. When last seen alive he was walking toward the bow of float 53. It is a legitimate inference that he went ashore, crossed over to the '58 and had at least loosed the short rack line since the float was pulled out without breaking it. To get into the water he must either have fallen or jumped. Conceivably after loosening the line he may have attempted to jump to the apron of Bridge 12 in order to remain ashore until the tug should return. Capt. DeMars testified that it is not unusual on such a short maneuver for a floatman, when he lets his line go, to jump ashore. However, since Johnson's duty was to remain aboard and tie together the bows of the floats, we think it a more reasonable inference that he accidentally fell from the 58. But what caused him to fall seems to us wholly conjectural. The plaintiff argues that the jury could infer that while he was loosening the rack line, the tug started to pull the float out before he expected, causing him to lose his footing and strike his forehead in some way that knocked him unconscious and threw him overboard. But the supposition that the tug started pulling out the float before he expected, presupposes that he did not shout the signal "all gone." The appellee argues that a bridgeman may have shouted "all gone" when he released one of the long rack lines, but no witness observed any bridgeman in the neighborhood. It was Johnson's duty, not the duty of a bridgeman, to give the signal when the short rack line was free, and the assumption that some one other than Johnson gave it at that precise moment seems to us pure conjecture. It is at least equally reasonable to infer that Johnson did give the signal for the tug to start and thereafter stumbled or for some other unknown cause fell and knocked himself unconscious. The record is a complete blank as to how or why he fell overboard. It is of course true that not always must a jury's verdict fall if it involves speculation and conjecture. As stated in Lavender v. Kurn, 327 U.S. 645, at page 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, when "the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." In the case at bar we think there was a complete absence of probative facts to support the conclusion that Captain O'Brien's failure to send a man to see where Johnson was when the "all gone" signal was heard caused his death. On the issue of causation the plaintiff had the burden of proof. In our opinion the motion for a directed verdict should have been granted. Accordingly the judgment is reversed.