**Margaret JOHNSON, as Administratrix of the goods, chattels and credits of Charles Johnson, deceased, Plaintiff,**

v.

**Howard S. PALMER, James Lee Loomis and Henry B. Sawyer, as Trustees of the property of The New York, New Haven and Hartford Railroad Company, Defendants.**

**Civ. A. No. 8871.**

United States District Court, E. D. New York.

Nov. 5, 1953.

---

David M. Fink, and Jacquin Frank, New York City, for plaintiff. William Rosenthal, New York City, of counsel.

Edward R. Brumley, New York City, for defendant. Robert Peet, New York City, of counsel.

GALSTON, District Judge.

This is the second trial of an action brought under the Jones Act, 46 U.S. C.A. § 688, to recover damages for the death of the plaintiff's intestate. On the first trial there was a verdict and judgment for the plaintiff in the sum of $20,000. On appeal, the Court of Appeals reversed, on the ground that the defendant's motion for a directed ver- dict should have been granted since the evidence did not justify a finding that the defendant's negligence had a causal relation to the intestate's death. John- son v. New York, New Haven & Hart- ford R. Co., 2 Cir., 194 F.2d 194. On certiorari, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77, the Supreme Court vacated the judgment of the Court of Appeals and remanded the cause for a new trial on the sole procedural ground that since the defendant had moved to set aside the verdict and for a new trial, but had failed, after the verdict, to move for judgment notwithstanding the verdict, it was entitled only to a new trial and not to a judgment in its favor.

On this second trial, there again was a verdict for the plaintiff, this time in the sum of $25,000. The defendant, pur- suant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., ` has moved for a directed verdict, to set aside the verdict and for judgment notwith- standing the verdict.

The critical question to be determined is whether the plaintiff has sustained the burden of establishing a causal re- lationship between any proved negli- gence and the death of Johnson. It was not proved in the first trial to the satis- faction of the Court of Appeals.

The decedent, Charles Johnson, was an experienced floatman employed on the defendant's tug, Transfer No. 10. He met his death by drowning on April 22, 1946 while the tug was removing two empty carfloats, No. 53 and No. 58, from the de- fendant's Oak Point railroad yard on the East River. No eyewitness saw the ac- cident, nor was Johnson's death known until some two hours later, when the tug had returned from completing its maneu- ver. His body was discovered floating in' the slip close to the apron of Bridge 12.` The defendant's operations in connection' with the removal of the carfloats on this occasion are detailed in the opinion of the Court of Appeals in connection with the first trial, and essentially no different facts were developed at the second trial.`

At this trial, as in the earlier trial, the plaintiff offered testimony that the tug

captain, before moving his floats and after hearing the "all gone" signal, did not see the person who gave the signal and did not recognize his voice. Expert witnesses testified for both sides as to the custom and practice in New York Harbor. Since the jury's verdict was for the plaintiff, it may be assumed that the jury chose to believe the plaintiff's expert witness. He testified that when a tug captain was unable to see the person giving the "all gone" signal and did not recognize his voice, it was the custom and practice to send a deckhand or the mate of the tug to a position where he could see whether the floatman, whose duty it was to give the signal, was in a safe position and was the person who had given the signal. The Court of Appeals stated that if the jury chose to believe this testimony, the Court was "not prepared to hold that it is so inherently incredible as to permit this court to substitute its judgment for theirs." 194 F. 2d 194, 197.

The plaintiff would infer from this finding that it was not Johnson who had given the signal. She contends that the "all gone" signal must have been given by somebody else when Johnson was still loosening the short rack line on the bow of Float No. 58, and that he must have fallen overboard when the float started to move unexpectedly. Captain O'Brien, the captain of defendant's tug, testified that the signal came from the direction of the bow of Float No. 58, at the apron of Bridge 12, where it was Johnson's duty to be to loosen the line and give the "all gone" signal. The plaintiff's evidence fails to show the presence of any other person either on the bow of Carfloat No. 58 or on the apron of Bridge 12. The plaintiff contends that the testimony on the presence or absence of bridgemen was vague on the first trial but on the second trial clear as to their presence. From the records of the two trials, it is reasonable to assume that the long rack lines were taken off by bridgemen. It is also clear in both trials, however, that there is nothing in the evidence to indicate that a bridgeman was in the neighborhood where the short rack line on the bow of Float No. 58 had to be loosened. The only reasonable inference to make is, therefore, that it was the decedent who shouted, "all gone".

In connection with the plaintiff's theory of an alleged unexpected maneuver of the tug, it may be noted that Captain O'Brien testified without contradiction that he did not start to pull the floats out until after he had got the "all gone" signal, and that the signal came after he observed that all the other lines, all in plain sight, were released. He also stated that after getting the signal he blew a "long slip whistle", indicating he was moving out.

According to the plaintiff's expert testimony, the custom and practice referred to earlier has as its purpose not only to determine whether the tug's own floatman was the person giving the signal, but also to assure that he was in a safe position. The plaintiff's expert witness testified as follows:

"Q. What is the danger of going ahead merely on hearing the voice cry of 'all gone'? A. Most anything could happen.

"Q. What, for instance? A. This man might be caught in the line, or he might fall overboard, or something like that."

From this testimony, it would appear that the object of making the check, in the circumstances in question, is to insure against dangers to the floatman even after he has given the "all gone" signal. With respect to possible dangers to the floatman, Gaglio, who found Johnson's body, testified that when he found the body he noticed the short rack line to Float No. 58 released and up on the rack.

Johnson's absence was noticed when the floats had been pushed beyond the short rack between Bridges 11 and 12, a distance of 50 to 60 feet from the apron of the bridges. When his body was found, it was floating in the water up against the short rack and about 18 feet from the apron of Bridge 12, where the

line from the short rack to the bow of Float No. 58 was located.

■ There is no evidence as to whether the decedent was in a safe place after giving the signal and as the floats were pulling away from the bridge aprons. To charge the defendant with liability in this case it must be shown that there was a violation of some duty imposed upon it which was responsible in whole or in part for Johnson's death. It must be established that he fell during the time when the duty rested upon the defendant to see that the floatman was in a safe place. From the fact that Johnson was missed when the floats had been pushed beyond the short rack, it may be inferred that he must have fallen some time between then and when the floats started moving away from the apron of the bridges. However, from the absence of evidence, to say either that he must have fallen as the floats started moving away from the bridges, or that he must have fallen after the floats had moved some distance away, equally involves speculation.

■ In reversing the judgment and verdict in the first trial, the Court of Appeals was of the opinion that the lack of any probative facts as to how or why Johnson fell overboard required the conclusion that the plaintiff had failed to sustain the burden of proof on the essential issue of causation. No facts were presented in this trial which would serve to remedy this lack of evidence. There is testimony that there was oil on the deck of Carfloat No. 53, near the stern. This seems to be the basis in fact for plaintiff's contention that the defendant failed to furnish the plaintiff's intestate with a safe place to work. Of course, the contention that Johnson might have slipped on this oil and fallen into the water cannot be tied in with the plaintiff's theory that Johnson might have fallen from the bow of Float No. 58, since the oil was on Float No. 53 and not Float No. 58. Furthermore, the evidence shows that Captain O'Brien saw Johnson walking forward on Float No. 53 towards the bow about half the length of the float on his way to release the short rack lines. Thus he was seen on the float beyond the place where the oil was found. In addition there is testimony by Gaglio and O'Brien, uncontradicted, that Johnson never got into the oil as he was walking forward toward the bow of Float No. 53.

I realize the responsibility involved in setting aside a verdict of a jury, especially here, after two juries decided in the plaintiff's favor. However, as I review the situation I cannot dismiss the thought that the jury was unable to reject from its consideration the element of sympathy, which is always present in a death case. Moreover, the jury was aided by a very forceful and able presentation of the plaintiff's case. Nor can I dismiss from my mind the possibility that confusion may have been caused when defendant's counsel discussed contributory negligence. I purposely avoided that subject in my main charge; but, of course, I had to yield to the request of the defendant to add an explanation of the law of contributory negligence. Once the jury had in mind that the defendant was urging contributory negligence by the decedent, it was not unlikely that the jury rather summarily concluded that the defendant was admitting negligence on its part.

In view of the decision of the Court of Appeals on the merits, which were not considered by the Supreme Court, the verdict will be set aside and judgment entered for the defendant. Settle order.