Petition of TRANS–PACIFIC FISHING
& PACKING CO., a corporation, for
exoneration from and limitation of lia-
bility, THE MV WESTERN CLIPPER.

M. Doremus, Administratrix of Estate of
Phillip LaFata, et al., Claimants.

No. 16071.

United States District Court
W. D. Washington, N. D.
March 11, 1957.

Bogle, Bogle & Gates, Edward S. Franklin, Seattle, Wash., for petitioner Trans-Pacific Fishing & Packing Co.

Levinson & Friedman, Sam L. Levinson and Edwin J. Friedman, Seattle, Wash., for claimants crew men Sizgorich, Mrvica, Neri and Doremus for the estate of LaFata.

BOWEN, District Judge.

### Statement of the Case

This action was submitted for the Court's decision upon the evidence adduced at the trial and upon the petition for limitation of liability on behalf of the vessel owner Trans-Pacific Fishing & Packing Co., a corporation, of Seattle, and also upon the claims and answers of three members and the administratrix of the estate of one deceased member of the crew of the tuna fishing vessel M. V. Western Clipper, respecting personal injuries and damages connected with two accidents, one on May 19, 1954 and the other on May 29, 1954, while the vessel was tuna fishing in Mexican and Central American ocean waters.

As to the May 19th accident, while the vessel was tuna fishing off the coast of Nicaragua, the crew including Sam Sizgorich was bringing in a fish net after it had been set for and had made its normal fish catch, when a hook and shackle was let fall upon Sizgorich's shoulder because of the breaking and giving-away of the nylon sling necessarily attached to the net and used in bringing the net in. The use being made of the nylon sling when it broke was in harmony with the normal use ordinarily made of the nylon sling in customary fishing operations. The Court found unseaworthiness of the vessel and privity thereof of the owner-petitioner, denied limitation of liability, held the petitioner liable for negligent injury of crew man Sizgorich and awarded him $7,500 for his injuries.

As to the May 29th accident, three of the crew members, Mrvica, Neri and La-Fata, while carrying out orders connected with refastening down of the canvas hatch cover after it had been pulled loose from its nailed fastening to the wooden coaming of the fish hatch by rough water breaking over the deck, and just as they were leaving the afterdeck upon finishing the hatch cover refastening work, a heavy sea came over the deck sweeping Mrvica, Neri and LaFata overboard. The seas were rough, the vessel was undergoing considerable labor, some shorting out of electrical ignition and lighting circuits resulting in small but difficult-to-control fires were being experienced in the engine room due to water leaking through a broken port and also through the deck. The weather was very bad and the vessel's skipper did not, immediately after they were swept overboard or when the weather moderated about 6:30 to 7:00 o'clock A. M., some 2½ hours after the men were swept overboard, nor at any other time, turn the vessel about or order it to do so to search for those men because he said it was dangerous, the vessel was hard to steer in the heavy seas, the weather was bad and the engineer advised against it. The skipper, however, did send out a "May Day" call for assistance, without obtaining relief. All three of the men after being washed overboard remained for at least a few minutes in sight of each other. Thereafter they became separated. The tropical sea water in which they were had a temperature of about 80°.

Other testimony was to the effect that, if the canvas had been fastened properly with cleats, it would not have come loose and required the crew's exposure to waves washing over the deck. It was also testified the vessel could have safely turned about to search for and pick up Mrvica, Neri and LaFata from the sea.

After being in the water about 14 hours, Mrvica was rescued by a passing steamship bound for Panama where he was hospitalized. He resumed his work in December 1954, again quit working in April 1955, and later worked for about a month on another fishing vessel. He had been under the care of a psychiatrist up to the time of the trial. He was 42 years of age at the time of the May 29th accident, and was earning about $6,000 to $8,000 per year as a fisherman. During the time he spent in the water, he experienced the nerve-racking ordeal of defending himself against numerous bites of small fishes and the savage threats of a large ocean going turtle which he finally overcame by thrusting his fingers in the turtle's eyes,—and then "she go away", as he piteously testified. As to his cause of action for personal injuries and damages, the Court found the vessel unseaworthy and the owner-petitioner in privity therewith, denied the petition for limitation of liability and awarded Mrvica $21,000 for such injuries and damages.

At the time of the May 29th accident, Neri was a young Mexican, 22 years old. At the trial he spoke no English, but through an interpreter testified that he swam, drifted and treaded water for about 56 hours after he was swept overboard before he was rescued by two sports fishermen who immediately took him to Acapulco where he was hospitalized because of sunburn and numerous bites of small fishes which caused much of his skin to be lost and damaged. His vision was temporarily injured by the bright sunlight while he was in the water, and he sustained shock. After a few days in the Acapulco hospital, he was returned by the Western Clipper to his home at Ensenada, Mexico. Due largely to his youthful age and vigorous health at the time of and since the accident, he has fully recovered from his injuries, having worked for some time regularly in his employment of a deep-sea fisherman. As to Neri's claim for personal injuries, the Court found the vessel unseaworthy, and the owner-petitioner in privity therewith, denied the petition for limitation of liability and allowed Neri the sum of $6,500 for his personal injuries and damages.

LaFata was a young fellow about 21 years of age at the time of the May

29th accident. He remained afloat in sight of Mrvica for about 14 minutes and afterwards within sight of Neri for about an hour. LaFata was lost in the seas, and his body was never found. He was a dutiful son, and contributed regularly before his death to the support of his parents and his younger brother. His father had been ill and unable to support the family regularly and died soon after the death of LaFata. His father's death further emphasized the necessity of the deceased LaFata's continuing to support his father's family. LaFata was an experienced fisherman with earnings of about $4,000 a year. As to the pending cause of action for his wrongful death and also as to the cause of action to recover for his injuries suffered by him before his death on account of the May 29th injuries, the Court found the vessel unseaworthy and the owner-petitioner in privity therewith, denied the petition for limitation of liability and awarded on account of the LaFata wrongful death action the sum of $15,000 and on account of the cause of action for the LaFata personal injuries sustained by him before his death the sum of $4,000.

The foregoing is intended by the Court only as an outline statement of the facts.

The Court: From a preponderance of the evidence in this case the Court finds, concludes and decides as follows:

As to the amount of damages sustained by the various damage claimants and the decedent Phillip LaFata, whose claim is represented by M. Doremus, administratrix of the estate of Phillip LaFata, deceased, the Court finds to be expressed reasonably in the following respective amounts:

■ The claimant Sizgorich sustained some personal injuries on account of the matters set out in his claim, but in the Court's opinion the extent of the damages is nothing like as great as he represented it to be. If taken in the most favorable light possible in his claim that there was some kind of a fracture in one of his shoulder bones, the medical testimony is not unanimous that surgery is necessary to correct any unfavorable condition existing in it, that there is no atrophy of muscles or tissues, he is in splendid general health and vigor after irregular work periods following his accident, and the Court finds his damages to date have been and are the total sum of $7,500 for all his general and special damages.

■ The Court finds as to the claim on behalf of his mother for wrongful death of the decedent Phillip LaFata, that the mother at the time of his death had a valuable prospect of very substantial support money from decedent as indicated by his turning over to his mother of a large part of his earnings regularly up to the time of his death in response to a definite family need that he do so, and that the mother has been damaged by the wrongful death of the decedent LaFata in the sum of $15,000, claim for which is included in the Doremus claim's first cause of action; and that, as to the second cause of action in the same Doremus claim, that is, for the alleged personal injuries suffered and sustained by the decedent Phillip LaFata from the time he was washed overboard until he drowned, he sustained damages in the sum of $4,000.

■ That the claimant who has filed a claim in this action who has in the Court's opinion suffered the greatest amount of personal injuries, as seems to me to be clearly and convincingly established by a preponderance of the evidence, is the claimant Mrvica. The Court cannot say and is not required to say why the results of his injuries, exposure and terror, and his fear and concern for his own safety, injured and damaged him so much more than a similar experience over a much longer period of time injured and damaged the claimant Neri who did not suffer anything like as large an amount of damages as were sustained by Mrvica. One thing I believe which figured in the difference in the seriousness of the results to those two men is the fact that when the injuries were occurring to them during the times these men were in the water be-

tween the time they were washed overboard and the times they were rescued is that Mrvica was forty-two years old and Neri was then a very much younger man, only about twenty-two years old, not much more than half the age of the claimant Mrvica, that is, when Neri was being exposed for fifty-six hours in the water to the personal injuries sustained by him while he was in the water from exposure to sun and wind and water and exhaustion from remaining in the water and exerting the effort which was involved in staying afloat all of those hours, and from the injuries he received from the schools of fish that nibbled and bit his body. However that may be and for possibly many reasons we shall never know, this young man Neri shows no signs of any injuries whatsoever at this time, and according to his work history since he returned to work following this ordeal of fifty-six hours in the water he has worked rather steadily, and his present good condition and all his reactions to his surroundings strongly indicate he is not at this time a man who experiences any bad results from his ordeal at sea; and that the extent of Neri's injuries and damages sustained proximately as the result of his being washed overboard on the occasion mentioned in the petition and in his claim is the sum of $6,500.

Mr. Levinson: This is Neri, Your Honor?

██ The Court: This is Neri. As to claimant Mrvica, on the other hand, the Court finds that he still shows very definite signs of having great nervousness and certainly a decided manifestation of uncontrollable tears when telling of his personal injuries from sea turtle attacks and the bites of small fish and from his grueling experiences during the fourteen hours spent by him in the water following his being washed overboard on the occasion in question. I believe that his condition will greatly improve after this litigation is finished, and I think his many concerns which are very serious to him will pass away afterwards and that he will show a great improvement after this litigation is over, not through any willful designs of his to delay his recovery but because of the fact that the hurts and injuries and damages received by him register in a more definite way now and are to him for the present at least of a more grievous nature. That by reason of all the matters and things in connection with his experiences and his injuries and damages Mrvica has been injured and damaged in the sum of $21,000.

 And the Court further finds that, in respect to the claimant Sizgorich and the decedent Phillip LaFata and the claimant Mrvica and the claimant Neri, and each of them, there is no evidence sufficient to base a finding of contributory negligence on the part of either one of them, and that each one of them at the time of the accident and at all times material to this action was in the exercise of due and reasonable care for his own safety; that each and all of them were engaged in the performance of orders for the carrying out of work necessary for the safety of the vessel on which they were employed and to try to save it from disaster. There is no possibility of a claim of any dereliction of caution or failure to exercise due care on the part of Sizgorich which could be possibly asserted, it seems to the Court. That is emphatically true of all the others.

██ And from a preponderance of the evidence it is the further finding, conclusion and decision of the Court that the owner and skipper of the vessel Western Clipper before and at the time these three persons were washed overboard were negligent, in that they failed to maintain a proper means of securing and failed to secure in proper, reasonably safe and useful condition the hatch covers and canvas on the fish hatch of the vessel Western Clipper, and that this condition persisted up to the very moment when these three persons were washed overboard, and such negligent condition of the hatch and the insecure and insufficient and unsafe condition in which the canvas, the hatch covers and coaming were at that time rendered the vessel unseaworthy as charged in the claims

and answers of the claimants filed herein in response to the petition for exoneration from and/or limitation of liability in this case.

■ Upon the evidence in this case it is inconceivable to me that it is consistent with due care and ordinary safe seamanship for any fishing vessel to put out from San Pedro to Central American and Mexican waters for an extended period of fishing with the canvas that is to be finally spread over hatch covers to complete the closing of the hatch to be fastened merely by the placing on top of the canvas two by fours or some other pieces of wood to be nailed down each time they are placed on with ordinary nails driven through the wooden pieces on top of the canvas through the canvas and into the top edge of the wooden hatch coaming, because it must be obvious to anyone that every time the hatch boards are removed and again replaced that the hatch boards themselves are weakened and damaged as well as the two by fours or other substitute wooden pieces and the coaming of the ship itself. The coaming is an integral part of the structure of the ship which is intimately connected with the structures necessary for its seaworthiness and safety, and if it be true, and I believe from the evidence it is true, that this vessel was passed by a competent marine surveyor shortly before this voyage began, and if it be true that that surveyor or any other seafaring man did or would overlook that situation relating to repetitive nailing down of the hatch covers as disclosed by the evidence, it is inexcusable and does not in any way tend in this Court's opinion to justify a shipowner in sending a vessel to sea with such haphazard arrangements for the removing and refastening of the hatches and the canvas that goes over the top of them. No vessel could be in a safe, sound and seaworthy condition after the hatches had been taken off and re-nailed two or three times or any number of times.

■ That the owners and their agents were further negligent in that they did not use due and proper care to protect and keep in safe working condition the electrical equipment and installations on the vessel which were necessary to the proper and safe navigation of the vessel and necessary to make her and keep her in a seaworthy condition, in that through the negligence and omission of due and ordinary care on the part of the owner and its agents water was allowed to leak from the deck spaces and through damaged windows into the engine room spaces and there saturate certain electrical equipment, with the result that the chief engineer himself reported to the skipper when he was in need of the good working efficiency of the electrical equipment in the navigation of the vessel that because of the wet and damaged condition of the electrical equipment in the engine room the vessel was unseaworthy, and the Court finds that for that reason also it was.

That all of these things contributed to the negligence and were part of the negligent acts and omissions of the owner and the skipper in failing to use due diligence to rescue these three persons who were washed overboard and resulted in making the vessel further in an unseaworthy and unsafe condition, thereby endangering the life, safety and well being of the members of the vessel's crew. This was a condition that existed at the time the three men were washed overboard and continued at all times while they were in the water and within the possibility of being rescued by the vessel from which they were washed into the sea.

■ It is the duty of every shipowner and ship operator to use every possible available means to rescue from the sea any and all persons and members of its crew who may be unfortunately washed overboard. In this instance the skipper and all those aboard at the time and the owner failed and neglected to do that, failed to use due care or to make any effort by turning the vessel about to attempt rescue other than to inquire of the chief engineer as to why it could not be done, failed to keep the vessel in condition so that she could be maneuvered and

turned around and search for those who had been washed overboard, failed to throw out any sort of a lifeline or any kind of a floating object, failed to cast into the water any skiff or debris or life rings or other lifesaving equipment, all of which constituted negligence on the part of the owner of the vessel and the vessel's skipper, the agent of the owner, and those assisting him, and all of these omissions proximately caused the results that followed in connection with the leaving of these men in the sea after being cast overboard, one until his death a short while afterwards, and another for fourteen hours and another for fifty-six hours.

That as to the claim of the claimant Sizgorich, that claim likewise is for personal injuries and damages resulting from injuries to his person sustained while he was working aboard that vessel as a member of its crew as a result of the breaking and giving away of the sling which was an integral part of the fish net, and this failure and giving away of the sling, which was made of nylon, occurred while the net was being brought in and taken aboard the vessel.

The Court finds, concludes and decides from a preponderance of the evidence that there was no overloading of the net with fish to the point anywhere near endangering the safety and security of the net if the sling had been reasonably sufficient for its usual purpose, but that the net had been and was at the moment being used in the ordinary course of ordinary fishing operations, and that the giving away of the sling was not due to any excessive load of fish in the net at the time.

The Court further finds, concludes and decides from a preponderance of the evidence that the nylon sling was insufficient and inadequate for the safe, normal and proper use as equipment for this fishing vessel and rendered the vessel unseaworthy to the extent that that nylon sling was reasonably needed for its use as a part of the vessel's reasonably necessary gear used in the normal fishing operations of the vessel.

That on account of the matters and things above stated, the petition of the petitioner for exoneration from and/or limitation of liability herein growing out of the matters and things set out in the petition and in the several claims and in the answers of the several claimants, must be and is denied.

The claimants are entitled to recover their taxable costs herein in addition to the other awards found and allowed by the Court.