**Mildred L. MILLER, individually and as Administratrix of the goods, chattels and credits of James W. Miller, deceased, Plaintiff-Appellant,**

v.

**FARRELL LINES, Incorporated, Defendant-Appellee.**

**No. 367, Docket 24066.**

United States Court of Appeals
Second Circuit.

Argued June 5–6, 1957.

Decided Aug. 16, 1957.

Herbert J. Kaplow, New York City, for plaintiff-appellant.

Stapleton, Flynn & Lilly, New York City (Daniel Flynn and George W. Sullivan, New York City, of counsel), for defendant-appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

This is an action brought under the Jones Act, 46 U.S.C.A. § 688, to recover for the alleged wrongful death of James W. Miller, the plaintiff's husband. The complaint alleged that Miller was caused to be "washed overboard" because defendant was "negligent in failing to maintain a proper and adequate guard. and watch over" Miller "when they knew or should have known of his disturbed condition; in failing to take adequate and necessary steps to have him relieved from his duties; in failing to render adequate, prompt and proper medical aid and attention, and in failing to take all the adequate, proper and necessary steps to conduct a search for him after he went overboard. As a result of all of which he was lost at sea and died on the 14th day of November, 1950." The defendant moved for a directed verdict both at the end of plaintiff's case and after the entire case. Judge Palmieri reserved decision in both instances and submitted the case to the jury. After the jury returned a verdict of $55,000 for the plaintiff, Judge Palmieri granted the defendant's motion to set aside the verdict and directed judgment for the defendant. From this decision the plaintiff appeals.

On November 10, 1950, a week following graduation from the United States Maritime Service School as a qualified assistant electrician, Miller signed articles on the S. S. African Glade, a C-2 type freighter, owned and operated by the Farrell Lines, for his first and last voyage as an assistant electrician. The ship sailed the evening of the same day for Dakar, West Africa. Miller shared a cabin in the forecastle with Chief Electrician Levy, his immediate superior. He had not previously shipped aboard this vessel and apparently knew no other members of her crew. Miller had been at sea for 22 years as he went to sea at the age of 14, and during his service in the British Merchant Marine he attained the rank of Master of British Ships.

About 6:00 P. M. on November 14 the Chief Electrician returned to his quarters and found Miller there reading, and about 6:30 P. M. Levy left him alone in the cabin. Around 11:30 P. M. Chief Steward Leopold Aiken saw Miller pacing the afterdeck and noticed nothing unusual about him except that he appeared deep in thought. This was the last time Miller was seen aboard the vessel. As may be expected in such a case there is no evidence as to the time, manner or place of his departure from the ship. The case was tried on the theory that.

Miller jumped overboard intending to commit suicide.

The next morning, November 15, Chief Electrician Levy got up about 7:30 A. M. He noticed that Miller's bunk had not been occupied that night but did not think it strange since Miller had not occupied his bunk the night before. When Miller did not show up at the 10:00 A. M. coffee break, Levy, after inquiring of his whereabouts from other members of the crew, reported him missing to the master, Captain Wilder.

Captain Wilder thereupon called all department heads and had a search of the vessel made for the decedent. Miller was not found and at 10:20 A. M. the African Glade turned back 180 degrees into her own wake on the course which it had just sailed.

Captain Feinne, plaintiff's maritime expert, testified that from his examination of the log book of the African Glade he concluded that the course she took after making this turn was not reciprocal, but was a parallel course, twelve or thirteen miles south of a reciprocal course. Captain Wilder, though admitting he did not have a navigational fix taken, testified that he turned the bow of the African Glade back into her own wake thus pursuing the reciprocal course.

During the search Captain Wilder sent a radio telephone message concerning the disappearance to his home office and one to the U. S. Coast Guard Weather Ship. Captain Wilder did not radio any of the other ships in the vicinity, admittedly the correct procedure, for the Coast Guard was in touch with all such ships.

When darkness fell at 5:16 P. M. the search was called off; the African Glade was then approximately 70 miles from the place where she had been when Miller had last been seen alive at 11:30 P. M. the night before. The ship then headed again toward Dakar.

In reserving his decision on the defendant's motion for a directed verdict, Judge Palmieri made it quite clear that it was his opinion that there was a complete lack of proof on the question of causation, but he let the case go to the jury to avoid the trouble and expense of a new trial should he later be held in error. In his charge to the jury, Judge Palmieri defined negligence and proximate cause and the jury was instructed that they could not find for the plaintiff for failure to make proper rescue efforts unless they first concluded that Miller was alive at 10:20 A. M. on the morning of November 15, 1950.

With the consent of counsel (subject of course to the defendant's motions for a directed verdict) Judge Palmieri then submitted special interrogatories to the jury which returned the answers as noted:

First: Did Miller's conduct aboard the S. S. African Glade between November 10, 1950 and November 14, 1950, manifest signs of instability which could reasonably have led the Master or his associate officers or Chief Electrician Levy to believe that there was danger that he might do harm to himself?

The answer is no.

Second: Upon being notified that Miller had disappeared from the S. S. African Glade at 10:20 A. M. on November 15, 1950,

(a) Was James W. Miller alive at that time?

The answer is yes.

(b) Did Captain Wilder, the Master of the ship, take all proper and efficient means to effect a rescue?

The answer is no.

Third: In addition to answering the above questions, please report your verdict as follows:

For the defendant—No.

Plaintiff—Yes.

(a) Amount, if any, awarded for the pain and suffering of James W. Miller. None.

(b) Amount, if any, awarded for the pecuniary loss to the widow. $10,000.

(c) Amount, if any, awarded for the pecuniary loss to the child. $45,-000.

■ Immediately after the verdict, Judge Palmieri granted the defendant's motion for a directed verdict on the ground that there was no proper basis for the establishment of any causal relationship between the alleged negligent search and Miller's death. We agree.

■ In a suit under the Jones Act, it is necessary to show that the allegedly negligent act or omission of the defendant caused, in whole or in part, the damage for which recovery is sought. Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 77 S.Ct. 443, 459, 1 L.Ed.2d 493; Ferguson v. Moore-McCormack Lines, Inc., 1957, 352 U.S. 521, 77 S.Ct. 457, 459, 1 L.Ed.2d 511. The burden of showing this causation rests on the plaintiff. Johnson v. New York, N. H. & H. R. Co., 2 Cir., 1952, 194 F.2d 194, reversed on other grounds 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77; Pittsburgh S. S. Co. v. Palo, 6 Cir., 1933, 64 F.2d 198. In this case the plaintiff did not introduce evidence of any probative facts to show that the defendant's negligence played any part in Miller's loss of life. The jury was required to indulge in a series of speculations.

The jury's first speculation was whether Miller left the ship and struck the water, 20 to 25 feet below the deck on which he was last seen, in such a way as to avoid the action of the propeller. There was evidence that a man jumping from the side of a vessel, aft of midships, would be caught in the suction created by the forward motion of the ship, drawn into the screw and mangled. Secondly, the jury would have to suppose that Miller had hit the water in such a way as to remain afloat. Even though the air and water temperatures were between 72 and 74 degrees during the pertinent period of time, there was no evidence that Miller took with him any means of staying afloat, such as a life preserver. On the contrary, the plaintiff's case was tried on the theory that Miller was unstable and meant to commit suicide. The fact that a man jumps overboard into the sea to commit suicide is hardly a factual basis for speculating on the ways and

means of his staying alive and afloat under circumstances of the greatest difficulty even for a much younger expert swimmer fighting desperately for his life. Indeed the record is barren of evidence as to whether Miller could swim.

Thus a further speculation is necessary, namely whether after entering the sea Miller changed his mind about suicide and did his best to stay afloat.

This in turn would lead to the speculation as to how long Miller, who was 36 years of age, could stay afloat, and whether he could and would stay afloat long enough for the ship to have reached him. Speculation on this issue in turn depended, at least in some measure, upon yet further speculation as to when Miller left the ship; for it would appear necessary to surmise such a moment in order to establish a causal relationship between the alleged negligent conduct of the defendant and the resulting death of Miller. Thus, if Miller had left the ship at 11:30 P. M. it would have taken the ship at least eleven hours to reach Miller after the discovery of his absence. That is, Miller would have had to stay afloat for twenty-two hours before he could be rescued. Indeed the speculation probably went further in view of plaintiff's claim that the African Glade should have kept on through the darkness until it had reached the point where she was when Miller was last seen at 11:30 P.M. and she should have stayed there until daylight and then combed the area in concentric circles for several hours.

■ Thus a series of speculations must all be indulged in and resolved in favor of the plaintiff in order to find any basis for saying that Miller could possibly have stayed afloat and alive long enough to be picked up. Each of these speculations must also reach a result which is contrary to the overwhelming probabilities. We do not see how the District Court could permit to stand such a jury finding in view of the fact that the plaintiff has the burden of proof. We do not believe that the Jones Act was meant to make ships the

absolute insurers of the lives of their crew members who are lost at sea.

There was no proof of any probative facts to indicate when, where or how Miller left the ship. There is no fact from which it could be argued that Miller desired to stay alive. In a case which was tried on the theory that Miller was in a suicidal state of mind and where all the facts seem to bear this out, it is difficult to justify a verdict which must be based in part on the speculation that he changed his mind.

Schulz v. Pennsylvania Railroad Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, we believe supports the defendant's position. Schulz, a capable and experienced workman who had been in Pennsylvania's employ for several years, was assigned to night work on four tug boats docked side by side. It was Christmas night and as the company did not have enough workers Schulz had to take care of all four tugs by himself. Three of the tugs were wholly unlighted and dark. In 10 degrees above zero temperature there was some ice on the tugs and Schulz had to go from one tug to the other by flashlight. He was last seen at 7 P. M. and an inspector found him missing at 1:25 A. M. Several weeks later Schulz' body was found in the water nearby, clothed only in shorts and socks and with a flashlight in his hand. It was conceded that he was not under the influence of alcohol when he reported for work, that he did not commit suicide, that there was no foul play and that he met his death by accident. Ib., 350 U.S. at page 525, 76 S.Ct. at page 609. In reversing our affirmance of the trial court's direction of a verdict for the defendant, Justice Black wrote at page 526 of 350 U.S., at page 610 of 76 S.Ct.:

"Fair-minded men could certainly find from the foregoing facts that the defendant was negligent in requiring Schulz to work on these dark, icy and undermanned boats. And reasonable men could also find from the discovery of Schulz's half-robed body with a flashlight gripped in his hand that he slipped from an unlighted tug as he groped about in the darkness attempting to perform his duties. * * * Fact finding does not require mathematical certainty, (footnoting Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916). Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn."

In Schulz there was considerable evidence from which the jury could conclude that Schulz met his death, at least in part, because of the defendant's negligence in having insufficient help to man unlighted and dark tugs which were icy in places. There were facts from which this conclusion could be drawn.

■ Here all the facts indicate that Miller had neither the intention to survive nor the means of survival when he disappeared from the African Glade. For Miller's alleged intentions, for his unobserved disappearance from the ship and for his apparent lack of any means to survive in the waters of the Atlantic Ocean it cannot be said that there was any basis for concluding that the defendant was responsible in whole or in part. The jury's conclusions were not based on common sense or reasonable beliefs. Schulz v. Pennsylvania Railroad Co., supra.

The District Judge would have been justified in granting the defendant's motion for a directed verdict, either at the end of the plaintiff's case, or at the conclusion of the entire case. In any event Judge Palmieri's direction of a verdict for the defendant, even after the jury verdict, was clearly right.

Judgment affirmed.