Mrs. Valerie Jean GARDNER, as Administratrix of the Estate of Robert Edward Gardner, Jr., deceased, Libellant,

v.

NATIONAL BULK CARRIERS, INC., in personam, and the THE SS BULK-CRUDE, in rem, Respondents.

No. 8022.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 29, 1960.

Sidney H. Kelsey, Norfolk, Va., for libellant.

Jett, Sykes & Coupland, R. Arthur Jett, Norfolk, Va., for respondents.

**WALTER E. HOFFMAN**, District Judge.

In this action under the Jones Act, 46 U.S.C.A. § 688, libellant seeks a recovery for the death of her husband, a member of the crew of The SS Bulkcrude, on December 8, 1958, while the vessel was southbound off the Florida Keys enroute from New York to Corpus Christi, Texas.

On the morning of December 8, the decedent, Gardner, complained to the master that he felt "shaky", whereupon he was given some medicine. He was also relieved from his 1200 to 1600 watch. Later the master instructed the chief mate to provide a relief for Gardner's 2400 to 0400 watch, but Gardner indicated that he intended to stand this watch. He was last seen at approximately 1830 on December 8 when he returned to his quarters. At 2340 a seaman went to Gardner's quarters to call him for his midnight watch. As he could not be located, this fact was reported to the master who immediately ordered a thorough search of the vessel, including an interrogation of most of the crew members to ascertain when Gardner had last been seen. The search of the vessel was completed around 0100 on December 9. Respondent contends that libellant has failed to establish the death, citing Mutual Life Ins. Co. of New York v. Zimmerman, 5 Cir., 75 F.2d 758, but the facts in that case are so clearly distinguishable that no comment is required. In the present controversy we have a crew member last seen at 6:30 P.M. while the vessel was off the Florida Keys; when reported missing at 11:40 P.M., a thorough search of the vessel

was conducted; the vessel did not dock for several days thereafter, and Gardner was not thereafter seen either dead or alive. The inescapable conclusion is that Gardner went overboard at some hour between 6:30 P.M. and 11:40 P.M. on December 8, 1958. Whether he met his death by drowning, by becoming involved with the ship's propellor, or by falling victim to a shark, barracuda, or other marine life, is immaterial.

From the time Gardner was last seen alive until the completion of the search around 0100 on December 9, approximately 6½ hours had elapsed. The vessel had, in the interim, traversed a distance of approximately 104 miles in smooth seas, on a dark night with no moon, with water temperature of 80 degrees, and under varying current conditions more adequately revealed by the testimony. At 0040 (12:40 A.M.) on December 9, the master sent a message to the Coast Guard at Miami reading as follows:

> "Seaman Robert E. Gardner missing from the SS Bulkcrude KBXM last seen about 1800 vicinity Tennessee Reef 24–42 North 80–44 West Stop First missed at 2330 when called for watch. All searches have been to no avail. Please advise."

In response, the Coast Guard advised that it would issue an "all ship's broadcast" and, at 0120 it sent an emergency message, followed by two hourly broadcasts through its marine operator, stating:

> "All shipping straits of Florida SS Bulkcrude advises seaman missing X Last seen on board about 2300Z vicinity Tennessee Reef 24-42 N. 80-44 W. X Keep sharp lookout possible man overboard."

Libellant urges that the vessel's master at no time requested the Coast Guard to take any affirmative action to search for Gardner. The answer lies in the testimony of the Chief of Search and Rescue Section who states that the Coast Guard places no importance on the difference between a request for search and a mere notification; that each situation is evalu-

ated separately to determine whether a search will be conducted and, in any event, any search would not be carried on at nighttime as the chances of locating a man in the water in darkness are very poor unless the man is equipped with a flare or its equivalent. Indeed, this witness described the chances of finding a man overboard at night as "almost impossible".

Much of the evidence relates to the various points passed by the vessel off the Florida Keys. In some instances the current was away from the Keys; in others the current was set in toward the shore line or Keys. Suffice it to say, there was no set pattern followed by the vessel. A course made good did not mean a course actually traversed. Of course, an object, such as a human being, entering the water will flow with the current. In short, the master—when faced with the realization that Gardner was overboard—was confronted with a variety of questions in making his decision not to reverse his course and search for the missing crewman. Among these problems are:

(1) The unknown time when Gardner apparently jumped overboard.

(2) The approximate place that such action took place.

(3) The distance traversed and elapsed time since Gardner was last seen.

(4) Whether the seaman avoided the propellor after hitting the water.

(5) Whether Gardner hit the water in such a manner as to remain afloat.

(6) Whether, assuming an intent to commit suicide, Gardner changed his mind after striking the water and endeavored to remain afloat.

(7) Whether he could and, with some reasonable possibility, would remain afloat long enough for the vessel to reach him.

(8) The darkness of the night.

(9) The dangers of shark, barracuda, and other marine life.

(10) The dangers incident to following a reciprocal course in returning to the Tennessee Reef area.

The Court discounts respondents' contention that any appreciable danger would be encountered by the vessel in reversing its course, thus requiring it to follow a path of travel customarily reserved for southbound ships. With the weather clear and sea smooth, the normal rules of navigation would not present any obstacle of note when contrasted with the duty imposed by law to conduct a search for the missing seaman, if such a search has any reasonable possibility of success.

As to the remaining problems confronting the master, the Court is in complete agreement with the master's conclusion that there was no reasonable possibility or probability of locating Gardner. It is argued that the vessel should have retraced its course for at least a short distance and a few hours. But it is a reasonable inference from the testimony that since Gardner was last seen around 6:30 P.M., his disappearance from the vessel more than likely occurred shortly thereafter, as other crewmen would have probably seen him around the vessel. A proper search under such circumstances, if required, would have entailed a return to the Tennessee Reef area, probably at a lesser speed to enable a proper lookout to be maintained in the interim. As the ship was off Rebecca Shoal Lighthouse around 1 A.M. on December 9, when it was substantially determined that Gardner was overboard, and as 6½ hours had elapsed, it means that The Bulkcrude would probably not have reached the Tennessee Reef area until some appreciable time after 8 A.M. Conceding, for the purpose of argument, that a good swimmer may survive indefinitely in water temperature of 80 degrees, it does not follow that any reasonable possibility of locating Gardner existed under the facts of this case.

This Court has previously held in Tate v. C. G. Willis, Inc., 154 F.Supp. 402, that there must be some causal relation between the alleged breach of

legal obligation on the part of the ship-owner and the loss of life. Some reasonable inference of probable success in saving the life of the seaman must exist. In Tate, the seaman fell into the Delaware River when attempting to board a tug from the dock. The only affirmative effort to rescue was to continuously play flashlights over the area where Tate entered the water which, admittedly, was in a confined area. While the facts of no two cases perhaps are identical, and while each case must rest upon the peculiar factual situation existing, the principles of law in Tate are believed to correctly state the rule in this circuit. Such is the reasoning in Harris v. Pennsylvania R. Co., 4 Cir., 50 F.2d 866, 868, where Judge Soper said:

> "But we have no doubt that a legal obligation rests upon a ship to use due diligence to save one of the crew, who, by his own neglect, falls into the sea; and that the owners are liable *if, by failing to perform this duty, his life is lost."*

See, also, Sadler v. Pennsylvania R. Co., 4 Cir., 159 F.2d 784.

■ Libellant, while not agreeing with the principles set forth in Tate, advances the novel theory that the question of causal connection is not applicable unless there has been some effort on the part of the ship to conduct a search. Stated otherwise, libellant argues that since there is an absolute duty under all circumstances to conduct a search for a crewman discovered to be overboard, the shipowner who fails to make any search is automatically negligent as a matter of law and is barred from advancing the defense of lack of possible or probable success in locating the seaman. Admittedly, in the present case, the master of the vessel did nothing by way of search for the missing man overboard other than to notify the Coast Guard. To accept libellant's premise it would, under any and all circumstances, be incumbent upon the ship to retrace its course and conduct a search, irrespective of the number of hours elapsed or miles traversed. We do not believe that the law

is subject to such a strict interpretation. The issue of causation has been repeatedly held to be a factor for consideration by the trier of fact in "failure to rescue" cases. New York Central R. Co. v. Grimstad, 2 Cir., 264 F. 334; Hutchinson v. Dickie, 6 Cir., 162 F.2d 103; Johnson v. New York, N. H. & H. R. Co., 2 Cir., 194 F.2d 194; Petition of Trans-Pacific Fishing & Packing Co. (The Western Clipper), D.C.Wash., 152 F.Supp. 44; Miller v. Farrell Lines, 2 Cir., 247 F.2d 503, certiorari denied 355 U.S. 912, 78 S.Ct. 342, 2 L.Ed.2d 273. The latter case, decided under the Jones Act subsequent to the decision of the Supreme Court in Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, held that the burden of showing causation rested upon the plaintiff, even though the negligence need only be shown to be *in whole or in part* that of the officers, agents or employees. The syllogism advanced in Miller is closely analogous to the views of this Court on the question of causation, although it must be noted that the vessel in Miller did attempt a search after a lapse of nearly 11 hours following the time Miller was last seen. There is nothing in the opinion of Circuit Judge Lumbard to indicate that the vessel was, or was not, under a duty to conduct this search.

■ We are told that the requirement of search is a contractual obligation and, therefore, the possibilities or probabilities of success only touch upon the sufficiency of the performance of the contractual duty to search and rescue. That it is a part of the implied contract with all seamen to use all *reasonable* means to save the life cannot be doubted. However, this action is instituted under the Jones Act which requires proof of negligence. That there may be an alleged breach of a contractual duty does not foreclose the right of recovery in tort, as will be seen from Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 174, 77 L.Ed. 368, where Mr. Justice Cardozo said:

> "We think the origin of the duty is consistent with a remedy in tort,

since the wrong, if a violation of a contract, is also something more. The duty, as already pointed out, is one annexed by law to a relation, and annexed as an inseparable incident without heed to any expression of the will of the contracting parties. For breach of a duty thus imposed, the remedy upon the contract does not exclude an alternative remedy built upon tort. * * * If the wrong is of such a nature as to bring it by fair intendment within the category of a 'personal injury' that has been caused by the 'negligence' of the master, it is not beyond the statute because it may appropriately be placed in another category also."

The Supreme Court, in reversing the Court of Appeals for the Second Circuit in Cortes, apparently recognized that, even where the negligence grows out of an alleged breach of contractual duty, there must, nevertheless, be a causal relation between the negligence and the death. 287 U.S. at page 378, 53 S.Ct. at page 177. Thus, it is apparent that the elementary principles of negligence (as required by the Jones Act) and causation must be established.

■ While not mentioned in the brief, and now apparently abandoned, the contention was once submitted that the provisions of 46 U.S.C.A. § 728 made it mandatory upon the master to conduct the search. The statute does impose an obligation upon any master to assist "every person who is found at sea in danger of being lost", providing assistance can be rendered without serious danger to his own vessel, crew, or passengers. The statute imposes a criminal penalty against the master. To impute civil liability upon the owner for the alleged criminal act of the master is contrary to Warshauer v. Lloyd Sabaudo S. A., 1 Cir., 71 F.2d 146. The point does not merit further discussion.

Holding that, under the peculiar facts of this case, the master of The Bulkcrude was not negligent in failing to reverse his course for the purpose of conducting a search, and that, in any event, there was no reasonable possibility of success and, hence, there was no causal relation between the negligence, if any, and the death, a decree will be entered dismissing the libel.

The Court, pursuant to General Admiralty Rule 46½, 28 U.S.C.A., adopts this memorandum in lieu of any specific findings of fact and conclusions of law.