310 F.2d 284
 91 A.L.R.2d 1023
 Mrs. Valerie Jean GARDNER, as Administratrix of the Estate
of Robert Edward Gardner, Jr., Deceased, Appellant,
v.
NATIONAL BULK CARRIERS, INC., in personam and the S.S.
BULKCRUDE, in rem, Appellees.
 No. 8362.
 United States Court of Appeals Fourth Circuit.
 Reargued May 28, 1962.
Decided July 31, 1962, Opinion Amended, Rehearing Denied and
DissentingOpinion Filed Oct. 26, 1962, Certiorari
Denied Feb. 18, 1963, See 83 S.Ct. 728.
 
 Sidney H. Kelsey, Norfolk, Va. (Ralph Rabinowitz, Norfolk, Va., on brief), for appellant.
 Roy L. Sykes and R. Arthur Jett, Norfolk, Va. (Jett, Sykes & Coupland, Norfolk, Va., on brief), for appellees.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 SOBELOFF, Chief Judge.
 
 
 1
 Failure of the master of a vessel to make any attempt to rescue a member of his crew lost at sea is the basis of the present suit, brought under the Jones Act, 46 U.S.C.A. 688, by the seaman's widow and executrix against the vessel and her owner.
 
 
 2
 The S.S. Bulkcrude was en route from New York to Corpus Christi along the Florida Keys at 11:30 p.m. on December 8, 1958, when seaman Robert Gardner was called to stand watch. He could not be found, and the master ordered a search of the vessel. The search, which lasted an hour or more, proved unsuccessful. Inquiry disclosed that Gardner was last seen about 6:00 p.m. that evening. At 12:30 a.m., December 9, the Coast Guard was notified by wireless, and it responded with an 'All Ships' Broadcast,' but the master took no further steps to find the missing seaman. Indeed, he did not alter the speed or course of the Bulkcrude either during or after the search. At 6:00 a.m., he reported Gardner's disappearance to the owner in New York and asked for instructions. The owner's answer was, 'Action must be decided by you as master.' No action was taken, and the vessel, which had maintained her course and speed through the night, continued on to Corpus Christi. These facts are not in controversy.
 
 
 3
 In addition, there was expert testimony at the trial that, under the environmental conditions existing that night, a man in the water might have survived and been saved by a reasonable search. The experts differed, however, in regard to the lapse of time and distance within which a rescue operation had hope of success. On the one hand, libellant's witness testified that a reasonable search over the entire course traveled by the Bulkcrude between 6:00 p.m. when Gardner was last seen, and 11:30 p.m., when he was reported missing, would probably have succeeded; while the respondents' experts expressed the opinion that an attempted rescue operation could hold hope of success only if Gardner had in fact gone overboard shortly before 11:30 p.m., when he was reported missing. Obviously these judgments are not conflicting in their entirety-- they agree that there was some range of time and distance in which rescue would have been possible if attempted. They agree at least that if the man entered the water not long before 11:30 p.m. and that fact had been known, then a search would have been indicated for it would have had a reasonable expectation of success.
 
 
 4
 The District Court presumed that Gardner went overboard soon after he was last seen at 6:00 p.m., rather than at some later point of time, and adopted the testimony of the respondents' experts as to the time and area within which an effective effort might have been made. On this basis the court arrived at the conclusion that, as Gardner was beyond rescuable limits, the master's failure to make the attempt had no causal connection with the seaman's death. Judgment was entered for the respondents. 190 F.Supp. 143 (E.D.Va.1960).
 
 
 5
 The survival of a seaman adrift at sea depends in large measure upon the diligence of those who are required by law to look for him. If they default in their duty, death is made certain. In recognition of this unyielding truth the admiralty law annexes to a seaman's contract of employment an obligation on the part of the master to use every reasonable means to save the seaman's life if he goes overboard. Harris v. Pennsylvania R.R., 50 F.2d 866 (4th Cir. 1931). In the cited case, after discussing the established obligation of the vessel to provide medical care and attendance to an injured seaman, Judge Soper for our court concluded: 'Equally clear is the obligation upon the part of the ship to save the life of a sailor who falls overboard through a misadventure, not uncommon in his dangerous calling. It is absurd to admit the duty to extend aid in the lesser emergency, and to deny it in the greater. In both cases, it is implied in the contract that the ship shall use every reasonable means to save the life of a human being who has no other source of help. The universal custom of the sea demands as much wherever human life is in danger. The seaman's contract of employment requires it as a matter of right.' Id. at 868-869.
 
 
 6
 This humanitarian rule, known as the rescue doctrine, has been approved by the Supreme Court, Cortes v. Baltimore Insular Line, 287 U.S. 367, 377, 53 S.Ct. 173, 77 L.Ed. 368 (1932), and followed in other circuits. See Johnson v. United States, 74 F.2d 703 (2d Cir. 1935); Kirincich v. Standard Dredging Co., 112 F.2d 163 (3d Cir. 1940); Miller v. Farrell Lines, 247 F.2d 503 (2d Cir. 1957); Smith v. Reinauer Oil Transport, 256 F.2d 646 (1st Cir. 1958); Barrios v. Waterman S.S. Corp., 290 F.2d 310 (5th Cir. 1961).[1]
 
 
 7
 The instant case presents no unheard of situation. Not infrequently, a seaman disappears from his vessel under unknown circumstances, and before he is reported missing several hours have elapsed since he was last seen. It can indeed be speculated, as the respondents suggest, that the seaman slipped, fainted or otherwise involuntarily went overboard, or that he entered the water bent on self-destruction. Likewise, it is conceivable that he was killed in the fall, cut to pieces by the propeller or drowned immediately; also, there may be speculation as to the precise point in time when these events occurred. But only one thing is known with certainty: often seamen who fall overboard survive for many hours in the water.[2]
 
 
 8
 The decisive question is, what was the master's duty in the present circumstances? The court found as a fact that turning back would have entailed no risk. The only thing that would have been lost in attempting rescue was time; the Bulkcrude might have reached its destination a half day late, at the most.
 
 
 9
 We hold that under the facts here the master did not do all that was required of him.[3]
 
 
 10
 The District Court, as we have noted, arrived at its conclusion exonerating the respondents by accepting their unsupported and unwarranted deduction that, because Gardner was last seen at 6:00 p.m., he must have gone overboard shortly thereafter and was surely beyond reach at 11:30 p.m. We think the court was in error in its basic premise that Gardner went overboard soon after he was last seen. In truth, no one could really know with any degree of certainty whether the fatal plunge occurred five minutes after he was last seen, or five minutes before he was reported missing, or at what intervening moment. Unless a search was made by that or other vessels in the area, it could not be determined that Gardner was beyond rescue. This is the classic situation which in reason and humanity called for the exertion of every reasonable effort to ascertain his whereabouts. We need not define how far or how extensive a search was called for in order to constitute a good faith performance of the ship's obligation. We hold only that refusal to make any effort whatever cannot be justified.
 
 
 11
 Proximate cause, the ship urges, has not been proved. Failure to reverse her course and conduct a search, the argument runs, does not of itself account for the death, since it has not been definitely shown that the man was alive and could have been saved. But this view ignores the underlying character of the duty. It was less than a duty to rescue him, but it was a positive duty to make a sincere attempt at rescue. The duty is of such nature that its ommission will contribute to cause the seaman's death. The duty arises when there is a reasonable possibility of rescue. Proximate cause is tested by the same standard, i.e., causation is proved if the master's omission destroys the reasonable possibility of rescue. Harris v. Pennsylvania R.R., 50 F.2d 866, 869 (4th Cir. 1931). Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability.
 
 
 12
 Moreover, the master's default-- virtually complete-- is emphasized by another consequence flowing therefrom. It obliterated all possibility of evidence to prove whether a search, if undertaken, would have succeeded or failed. This alone has in analogous situations been considered a sufficient ground to fasten responsibility on the wrongdoer.[4] However, we do not rest our decision on this principle.
 
 
 13
 The respondents offer no acceptable explanation of the master's conduct. They seek to justify it by the argument that unavoidable passage of time and distance relieved him of the duty to do more than he did. They develop this defense as a conclusion from two premises: first, they say that hte master had no duty to stop the Bulkcrude while she was being searched to ascertain whether Gardner was still aboard; and second, that since the vessel steamed on during the search for an hour and a half after Gardner was reported missing, all possibility of then conducting an effective search of the waters was thereby erased. The defense is unacceptable.
 
 
 14
 We do not imply that in every case immediately upon word of a seaman's absence from his watch all progress of the ship must be halted and the ship reversed for rescue operations while a search is made aboard for the seman. It is realized that the master is called upon to make his decision on the basis of uncertain fact.
 
 
 15
 We hold that the burden of the risk involved in the master's inaction must be cast by the law on him and the ship, and not on the helpless man in the water. If the rescue doctrine is not to be utterly stultified, this must be the rule. The grave obligation of rescue is not to be satisfied merely by a search of the vessel. A master who abandons a missing seaman while there is yet a reasonable opportunity to save him, acts at his own risk.
 
 
 16
 In the circumstances of this case, the inaction of the master established a neglect of the duty of rescue-- a neglect from which a contributing cause of the seaman's death is fairly and conclusively drawn by law.
 
 
 17
 Reversed and remanded for the determination of damages.
 
 
 18
 HAYNSWORTH, Circuit Judge (dissenting).
 
 
 19
 I agree with the Court's statement of the governing legal principle that duty of search arises when there is a reasonable possibility of rescue. I agree also that if the duty is neglected and the seaman is lost, the burden ought not to be upon his representative to establish the fact that he was alive and would have been saved by a reasonable rescue effort. I respectfully disagree, however, with the Court's resolution of the factual issue, for the finding below that there was no reasonable possibility of rescue is amply supported by evidence. Since McAllister v. United States,[1] it is plain that this Court has no power to try the factual issues de novo, or to substitute its appraisal of the facts for that of the District Court when the District Court's findings are not clearly erroneous. We, of course, exceed out appellate powers when we consider findings made by the District Court in disregard of their evidentiary basis or without sufficient regard for th eevidence upon which the findings were predicated.
 
 
 20
 Gardner had been ill. He had missed his preceding watch on that account and was contemplating hospitalization. He was last seen at approximately 1800 in the evening going in the direction of his quarters. The next day footprints were observed on a beam immediately beneath the port in the head just aft of the forecastle in which Gardner was quartered.
 
 
 21
 At the time, in early December 1958, the Bulkcrude was southbound through the Florida Straits. She was off Tennessee Reef when Gardner was last seen. When Gardner was first missed, approximately five and one-half hours later, the ship had made good eighty-five miles, and, by the time the search of the ship was completed, the Bulkcrude was approximately one hundred and five miles from Tennessee Reef. The weather was clear and the sae calm, but the night was dark and moonless. There was testimony of great danger of one going over the side of a vessel being sucked into the propeller, particularly when the ship is in ballast and riding high as the Bulkcrude was. There was also testimony of danger to one who might avoid the hazard of the propeller from sharks and barracuda. Of even greater importance, there was abundant testimony that the currents over the Bulkcrude's track that night sometimes set in toward the Florida Keys, sometimes out from the Keys. This is readily apparent from the plot of the vessel's track, and all witnesses agreed that, to compute the drift of a floating body in the water, one would require knowledge of the place along the track at which the body entered the water. Without knowing where Gardner went overboard, there was no way to determine whether his drift would be inshore or offshore.
 
 
 22
 Under these circumstances, several masters, testifying for the respondent, expressed the opinion that there was no reasonable possibility of rescue. Each of those witnesses testified that, under the circumstances, he would not have turned the ship about had he been in the position of the Bulkcrude's Master. Those witnesses, the Bulkcrude's Master and the Bulkcrude's Mate, all testified that, without more specific information than that Gardner went overboard at sometime between 1800 and 2330, there was no way to tell where to go to look for him, and that unless one knew within reasonable limits where to search, any search would be futile.[2] Moreover, one of the libelant's two witnesses, the Chief of the Search and Rescue Section of the Fifth Coast Guard District, testified that it was 'almost impossible' to see a man in the water at night, unless the man in the water was equipped with flares or other special signaling equipment. He further testified that had he been on duty in Miami, he would not have launched a Coast Guard search that night, and if he launched one the next day, it would not have been very extensive because of the circumstances and the wide expanse of water to be covered.
 
 
 23
 The Coast Guard Chief Warrant Officer on duty in Miami, who received the Bulkcrude's message early on the morning of December 9, testified that he initiated no rescue effort because, in his opinion, rescue was impossible. He said there was such uncertainty as to the time and place where Gardner went overboard that any search that night or the next day was impractical. Even if he had known where Gardner went overboard, he would not have launched a Coast Guard search during the hours of darkness, but would have sent a plane after sunrise. Not knowing where to send the plane, however, none was sent. He did send a series of All Ships Broadcasts notifying other shipping in the Straits to be on the lookout for Gardner. Further steps he thought were futile and impractical, and no further steps were taken.
 
 
 24
 It is apparent that none of these witnesses assumed that Gardner went overboard soon after he was last seen as approximately 1800. Their difficulty arose out of the fact they had no basis for assuming when between 1800 and 2330 he went overboard, and it was on that account that they all agreed that the Master of the Bulkcrude had no basis for deciding where to look for Gardner. There was also general agreement among these witnesses that because of the cross currents and the darkness of the night, there was little or no point in the Bulkcrude reversing her course and proceeding back along her own track. Only one witness, one of the two offered by the libelant, was of the opinion that had the ship been turned on a reciprocal course there was a reasonable possibility that Gardner, if alive and 'weiggling in the water,' might have been sighted and rescued.
 
 
 25
 As noted by the majority, several of these witnesses indicated that they would have undertaken some search if they had known that Gardner went overboard shortly before he was missed, for, in that event, they could pinpoint the area of search. With that information, they could determine the ship's approximate location at the time he went overboard, they could compute Gardner's drift, and the ship could proceed to the place where Gardner could be expected to be found, if, indeed, he had survived the other hazards and was still afloat and alive. There was no agreement among the witnesses, as the majority indicates, that without such information some search in a limited area and time should have been or would have been undertaken. On the contrary, all of the respondent's witnesses and one of the two witnesses for the libelant agreed that a search and rescue effort was hopeless under the circumstances which confronted the Bulkcrude's Master that night in the light of the darkness of the night and of the fact that he had no basis for a determination of a search area.
 
 
 26
 It is true that the District Judge at one point in his opinion said it was more likely that Gardner went overboard shortly after he was last seen at approximately 1800 than at some later time, but earlier in his opinion he recognized that the real problem confronting the Master was the absence of any basis for any rational assumption as to when and where Gardner went overboard. If fault might be found with that later speculation, it was not a general assumption that Gardner went overboard shortly after 1800, and it does not defeat the District Court's expressed recognition of the fact that the real and insolvable problem confronting the Master was the fact that nothing was known as to when, during the five and one-half hour period, and where, during the eighty-five miles of travel, Gardner went overboard. If, however, that speculation might be said to have infected the general findings of the District Court, this Court would not be justified in making its own findings in disregard of other specific findings of the District Court, particularly when the District Court's findings are not only not clearly erroneous, but are supported by the great weight of the testimony.
 
 
 27
 I think we exceed the permissible bounds of appellate review when we disregard the abundant testimony supporting the finding that there was no reasonable possibility of rescue of Gardner, or we violate the substantive principle we profess to apply when we insist that there was a reasonable possibility of rescue in the face of the contrary finding below and the abundant evidence which supports it.
 
 
 28
 I think this case presents only a factual question which was foreclosed by the District Court's findings.
 
 
 
 [1]
 A number of district court cases have applied the doctrine. United States v. Knowles, 26 Fed.Cas. 800 (No. 15,540) (D.C.N.D.Cal.1864); Salla v. Hellman, 7 F.2d 953 (S.D.Cal.1925); The G. W. Glenn, 4 F.Supp. 727 (D.Del.1933); Tompkins v. Pilots Ass'n for Bay and River Delaware, 32 F.Supp. 439 (E.D.Pa.1940); Ferro v. United States Lines Co., 74 F.Supp. 250 (S.D.N.Y.1947); Petition of Trans-Pacific Fishing & Packing Co., 152 F.Supp. 44 (W.D.Wash.1957); Tate v. C. G. Willis, Inc., 154 F.Supp. 402 (E.D.Va.1957); Tweedy v. Esso Standard Oil Co., 190 F.Supp. 437 (S.D.N.Y.1960)
 
 
 [2]
 At trial, libellant tendered proof of the high proportion of successful sea rescues conducted by the Allies during World War II. This revealed a large number of successes following as much as twenty-four hours in the water. Perhaps, however, the most striking example of a man's ability to survive is found in Petition of Trans-Pacific Fishing & Packing Co., 152 F.Supp. 44 (W.D.Wash.1957). There a seaman was saved after he 'swam, drifted and treaded water for about 56 hours after he was swept overboard.' Id. at 46
 
 
 [3]
 We are mindful of other circuit court decisions excusing the master's failure to search the waters. See Miller v. Farrell Lines, 247 F.2d 503 (2d Cir. 1957). That case, however, was tried on the theory that the seaman had committed suicide, and the court declined to presume in such circumstances that he changed his mind and could have been saved by a reasonable search. See also, Barrios v. Waterman S.S. Corp., 290 F.2d 310 (5th Cir. 1961). On the other hand, in Salla v. Hellman, 7 F.2d 953 (S.D.Cal.1925), a master's failure to attempt rescue of a seaman who fell overboard during a storm established liability, even though there was no affirmative showing that an attempt would have succeeded. See also, Kirincich v. Standard Dredging Co., 112 F.2d 163 (3d Cir. 1940)
 
 
 [4]
 In a negligence case the Supreme Court of Canada has said:
 'What, then, the culpable actor has done by his initial negligent act is, first, to have set in motion a dangerous force which embraces the injured person within the scope of its probable mischief; and next, in conjunction with circumstances which he must be held to contemplate, to have made more difficult if not impossible the means of proving the possible damaging results of his own act or the similar results of the act of another. He has violated not only the victim's substantive right to security, but he has also culpably impaired the latter's remedial right of establishing liability. By confusing his act with environmental conditions, he has, in effect, destroyed the victim's power of proof.
 'The legal consequence of that is, I should say, that the onus is then shifted to the wrongdoer to exculpate himself; * * *.' Cook v. Lewis, (1951) Can.Sup.Ct. 830, 832-33, (1952) 1 Dom.L.Rep. 1, 3-4 (1951). This quote is from the concurring opinion by Judge Rand, but it is in line with the expressed view of Judge Cartwright writing for the majority. (1951) Can.Sup.Ct. at 842-43 (1952) 1 Dom.L.Rep. at 18.
 To the same effect is Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 248 S.W.2d 731 (1952). There two actors had done independent acts resulting in the pollution of a stream, and the court relieved the plaintiff of his burden of proving the extent to which the defendant and other causes, respectively, contributed to the injury. The court applied the principle that where a wrongdoer has united his tortious conduct with other causes resulting in injury to another, justice dictates that he may not take advantage of the fact that he has thereby prevented the injured person from demonstrating the defendant's share in the resulting injury. See also, Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1, 5 A.L.R.2d 91 (1948); Meier v. Holt, 347 Mich. 430, 436, 80 N.W.2d 207, 213 (1956) (dissent); Harris v. Cleveland, 294 S.W.2d 235, 241 (Tex.Civ.App.1956). Prosser describes the rule as requiring the defendant to 'exonerate itself or pay.' Prosser, Torts, 207-08, 230-31 (2d ed. 1955).
 Analogously, there has long existed a rule of evidence that if a party intentionaly or fraudulently destroys a written document with the intent to suppress evidence, its content is presumed to have been detrimental to him. Omniaprae sumuntur contra spoliatorem. See Berthold-Jennings Lumber Co. v. St. Louis, I.M. & S. Ry., 80 F.2d 32, 41, (8th Cir. 1935), 102 A.L.R. 688.
 
 
 [1]
 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20
 
 
 [2]
 There is no doubt but that the Master, by questioning all members of the ship's company, did everything he could to obtain more definite information as to when and where Gardner went overboard