Fletcher SILVER, Libelant,

v.

AMERICAN EXPORT ISBRANDTSEN LINES, INCORPORATED, Respondent.

No. 8515.

United States District Court, E. D. Virginia, Norfolk Division.

March 25, 1970.

Leonard B. Sachs, Norfolk, Va., for libelant.

William B. Eley, Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

## MEMORANDUM

Libelant, Silver, a longshoreman, brings this action in admiralty against the shipowner, American Export Isbrandtsen Lines, to recover damages for personal injuries sustained by him when he fell from a gondola car during un-

loading operations alongside the vessel after being struck by a log as it was hoisted from the car to be loaded into the vessel. The principal issue is whether, under the circumstances of this case, the vessel was unseaworthy.

In resolution of various conflicts of testimony, the Court makes the following findings of fact:

Libelant, Silver, a member of a gang of longshoremen, was injured in the early morning hours of May 22, 1964, while loading logs from a gondola car onto the S. S. Exford at the Lamberts Point docks in Norfolk. The walnut logs, fifteen to sixteen feet in length and weighing about 2,500 pounds, were being hoisted from the car into the hold of the ship by means of two twenty-foot running hook wire slings attached to a cargo hook which had a metal-to-metal type triple swivel.

During the course of the loading operation, which had begun the night before, some of the logs had been turning or spinning as they were hoisted according to the testimony of Silver during the time he was working on the gondola car. Breeden, a superintendent for Atlantic and Gulf Stevedores, testified to the contrary, stating that all of the logs which he saw remained straight right into the hold. While each witness has potential bias, we were nonetheless impressed with the demeanor of Silver and think that, as the man working closer to the logs, he would have been more aware of any movement. At the same time Breeden, who was not working as close, may have meant only that there was no pronounced twisting. Accordingly, we find that prior to the accident other logs were twisting but to what degree is not clear, although it is apparent that, at best, the twisting was slight.

Just prior to the accident, Silver and a co-worker hooked a log to the hoisting apparatus and stepped aside for it to be hoisted. Silver went to the forward inshore corner of the car where he stood several feet to the side of the log being lifted with one foot on a log which was even with the top of the car, and the other foot on the edge of the car. Silver then signaled for the log to be lifted and it was raised to a point two to three feet above the car when its upward movement was halted. At this point the log may have swung toward the ship three to four feet and then have twisted, or it may have just twisted, but in either event we find ample evidence that the log did start to twist before it struck Silver. The testimony of Silver that after the accident he could see about a foot of the log hanging over the car indicates that the log did turn at least at some point. On the basis of all the evidence we find that the log was turning slightly at the time that it struck Silver.

It is undisputed that no tag lines were used in this loading operation. It is also undisputed that tag lines have never been used in the Port of Hampton Roads for loading logs of this type. They have, however, been used when loading such items as pilings, steel beams, heavy boxes, automobiles, or telephone poles. They have also, according to one witness, been used in Cuba for the loading of logs.

There was a conflict of testimony as to whether tag lines would have been useful in preventing logs such as these from twisting. The better evidence, however, was that before a log starts to turn, a tag line may be used to prevent it from starting such a turn. Once it starts to turn the tag line would allow some, though not complete, control. There was also a dispute as to whether the use of a tag line would have been helpful in preventing this accident. Breeden testified that it would not, but since his testimony was based on his opinion that the log did not twist, but merely swung, his testimony is less persuasive than that of others who thought the line would be useful. Accordingly, we find that use of tag lines would have been one way to minimize the risk of such an accident. We do not find that the use of tag lines would have prevented the accident.

Finally, 29 C.F.R., section 1504.81(f), the Safety and Health Regulations for Longshoring, Subpart H—Handling Cargo, provides that "Loads requiring continuous manual guidance while in motion shall be provided with tag lines." There was a conflict in the testimony as to whether the loads in this case required "continuous manual guidance." We find that in order to move the logs without damage to them or the ship, no tag lines would be needed. In order to reduce the chance of injury to personnel, tag lines would be one way to cut down on the risks as the logs are hoisted. There was, however, no evidence that any manual guidance would be needed after the logs were clear of the car, thus the guidance needed, if any, was not continuous.

■ Libelant seeks to recover from the shipowner for damages resulting from the accident. It is now settled that the warranty of a seaworthy vessel extends from the shipowner to a longshoreman, if the longshoreman is performing the type of work traditionally done by seamen. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

The question is whether the shipowner should be liable to the longshoreman for violation of the warranty of seaworthiness, either from the shipowner's failure to supply tag lines for the control of logs as they were hoisted, or because of the alleged operating negligence of the stevedore in failing to instruct the longshoreman to stand in a safer position as the logs were hoisted. The latter question was not urged in argument.

Libelant contends that the failure to use tag lines in this loading operation *per se* renders the vessel unseaworthy. We do not agree.

The method of loading logs, as described in the findings of fact, was without dispute a reasonably fit means of getting the logs from the car to the hold of the ship, even though there was potential danger to personnel. In sub-stantially every loading or unloading operation there is potential danger to personnel in some degree. While it is true that tag lines would reduce the risk of injury to personnel, it also seems to be equally clear that a longshoreman could simply move out of the way before the log was hoisted. Nothing in the evidence indicates that it would have been impossible for the longshoreman to avoid the potential path of the logs either by climbing down the ladder at the end of the car or by walking to the end of the car away from where the logs were being hoisted. The foregoing statement does *not* suggest that Silver was guilty of contributory negligence or otherwise assumed the risk of injury, but is made for the purpose of demonstrating the "reasonableness" of the method used.

■ It was undisputed that tag lines have never been used in the Port of Hampton Roads for loading logs or, to the knowledge of the witnesses in this case, elsewhere on the East Coast with the exception of Cuba. Although we recognize that custom in the trade is not controlling, The T. J. Hooper, 60 F.2d 737 (2 Cir., 1932), we are nevertheless reluctant to rewrite the Longshoring Regulations, prepared by far more knowledgeable persons, in order to require tag lines when there apparently was another simple means to protect personnel. Hence, we hold that the failure to use tag lines did not *per se* render the vessel unseaworthy.

The question still remains, however, whether there was operating negligence by the stevedore which thereby renders the owners liable under the warranty of seaworthiness as a result of the failure of the stevedore to instruct the longshoreman to stay to the side of the logs as they were being hoisted. While this point was not briefed or stressed in argument, we think it better to consider same. If there was such negligence, then there is a further question whether the plaintiff would be chargeable with contributory negligence for unnecessari-

ly standing in a potentially unsafe place. These questions are interesting ones involving somewhat unsettled positions for this circuit.

At this point we must determine when a ship can be rendered unseaworthy as a result of operating negligence of the stevedore. While the law in this circuit is somewhat confused, other circuits have considered the question.

The Second Circuit in Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961, rehearing denied, 386 F.2d 444 (2 Cir., 1967), cert. denied 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968)[1] and Alexander v. Bethlehem Steel Corp., 382 F.2d 963 (2 Cir., 1967)[2] held that, in view of Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967), a ship can be rendered unseaworthy solely on account of the negligence of a longshoreman during loading operations. Thus, according to Judge Edelstein in Mendoza v. A/S J. Ludwig Mowinckels Rederi, 293 F.Supp. 1319 (S.D.N.Y., 1968), the law in the Second Circuit is that operational negligence of a stevedore can render a vessel *pro tanto* unseaworthy.[3]

The Fifth Circuit rejects the notion that operating negligence can create "instant unseaworthiness." Antoine v. Lake Charles Stevedores, Inc., 376 F.2d 443 (5 Cir., 1967), cert. denied 389 U.S. 869, 88 S.Ct. 145, 19 L.Ed.2d 146 (1967); Robichaux v. Kerr McGee Oil Industries, Inc., 376 F.2d 447 (5 Cir., 1967); Moye v. Sioux City and New Orleans Barge Lines, Inc., 402 F.2d 238 (5 Cir., 1968); Parker v. Cargill, Inc., 417 F.2d 772 (5 Cir., 1969), cert. denied 397 U.S. 973, 90 S.Ct. 1089, 25 L.Ed.2d 267 (March 3, 1970). At the same time, it has held that operating negligence of an independent contractor can create an unseaworthy condition where such negligence extended over an appreciable period of time. Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5 Cir., 1969).

The Ninth Circuit states clearly that it is no defense to the shipowner that the stevedore, rather than the shipowner, brought about the condition of unseaworthiness. It specifically cites improper use by the stevedore of nondefective equipment as one means of creating an unseaworthy condition. Blassingill v. Waterman Steamship Corporation, 336 F.2d 367 (9 Cir., 1964).[4] The Ninth Circuit, somewhat like the Fifth, distinguishes between negligence occurring at the moment of injury (which does not create unseaworthiness) and that occurring prior to the injury. Beeler v. Alaska Aggregate Corporation, 336 F.2d 108 (9 Cir., 1964).[5]

1. In Candiano, a beam, which had been improperly attached to the cargo lowering mechanism, fell and struck the plaintiff. The trial court found that there was an appreciable period of time between when the beam was attached and when it fell, but the Court of Appeals apparently thought this fact insignificant.

2. In Alexander, the crane operator allowed a lift to fall so that the steel beams attached to it struck dunnage which the plaintiff was removing from the area where the steel was to be stored, thereby injuring the plaintiff.

3. In Mendoza, plaintiff was standing in front of an automobile attempting to push it from a hole in the dunnage floor of the hatch while another longshoreman attempted to drive the car in reverse. The spinning wheels kicked a piece of the loose dunnage out from under the automobile and it struck the plaintiff. There was testimony that it was not uncommon for longshoremen to move cars in this manner, but *no proof that such procedure was proper.* The driver had received the keys from the hatch boss who was present during the unloading operation. On these facts the court found that there was operational negligence which rendered the vessel unseaworthy.

4. In Blassingill, plaintiff was injured by a burlap bale which fell from a sling after the hatch boss, an employee of the stevedore company, ordered that four bales, instead of two, be placed in the sling thereby creating an unseaworthy condition.

5. In Beeler, the walking boss, an employee of the stevedore company, under the mis-

The Third Circuit has held that the negligent use of ship's equipment by the stevedore made the ship unseaworthy. Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir., 1964).[6] The Court, in *Ferrante,* went on to state that the "stevedore failed to perform safely." If this language is the standard for determining unseaworthiness in the Third Circuit then it would appear to include nonnegligent conduct of the stevedore whenever there is a risk created. In Thompson v. Calmar Steamship Corporation, 331 F.2d 657, 659 (3 Cir., 1964), cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964),[7] the Court stated that "The shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability, and this is true whether the unseaworthy condition be of a permanent or merely a temporary nature." If this "liberal" language in *Ferrante* and *Thompson* is an accurate statement of the law in the Third Circuit, then the longshoreman can effectively bypass the limitations of 33 U.S.C., section 905 which provides that the liability of an employer as prescribed in the Longshoreman's and Harbor Workers' Compensation Act shall be exclusive. The longshoreman can simply sue the shipowner under this broad definition of unseaworthiness and the shipowner in turn will implead the longshoreman's employer, the stevedore, for any negligence on its part.

In this Circuit the Court said in Scott v. Isbrandtsen Company, 327 F.2d 113, 125–126 (4 Cir., 1964), that "evidence of

the negligence of the longshoremen themselves in the performance of the ship's work and in their method of operation may present a factual issue as to whether an unseaworthy condition is created for which the shipowner may be held liable for injury to a longshoreman resulting from such condition. This is true even though the condition be transitory and without knowledge of the ship's officers." In Satchell v. Svenska Ostasiatiska Kompaniet, 385 F.2d 76, n. 1 (4 Cir., 1967), the Court construed *Mascuilli, supra,* as establishing the doctrine that operating negligence is subsumed under unseaworthiness. In Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347 (4 Cir., 1968), the Court stated that operational negligence should be subsumed under the doctrine of unseaworthiness and that no attempt should be made to distinguish between the two. In footnote 5 it quoted from a portion of the charge by the District Judge that:

"If an unsafe condition existed on the vessel and if, in your opinion, such unsafe condition constituted unseaworthiness, no matter for how short a time, and if that unseaworthiness was created or did come into play by reason of the stevedore or its longshoremen, then if you further believe that such unseaworthiness was a proximate cause of the plaintiff's injuries, the defendant is liable."

The *Venable* court then rejects this charge because the district court meant to imply that operational negligence

taken notion that another man would replace him, walked away from a ladder which plaintiff was descending and which required holding in order to keep it from slipping. The court held that the walking boss' negligence rendered the vessel unseaworthy.

6. In Ferrante, the stevedore's method of assembling two piles of plywood boards "side by side" to make a sling load caused the load to come apart so that some of the boards fell and injured the plaintiff.

7. In Thompson, the longshoremen tied the bull line from one of the hatches to three

loaded ralroad cars and used the ship's winch to jerk the cars forward and bump another car into position. Plaintiff, who was tending the brake on the car being moved, was seriously injured when he was thrown from the car by the strong impact of the other three cars. The court found the loading procedure to be "highly questionable" so that it was proper for a jury to find that the method used to load the ship's cargo created an undue risk to those called upon to load it, thereby making the vessel unseaworthy.

*standing alone* would not be sufficient to support a recovery. Then the balance of the footnote implies that the Court subscribes to a theory of absolute liability. In the denial of the petition for rehearing en banc, however, the Court seems to reverse itself, stating that:

> "We adhere to the view that operational negligence may cause unseaworthiness, but do not intimate that every instance of operational negligence necessarily creates liability under the unseaworthiness doctrine. The defect in the charge of the District Court, which required reversal, is that it ruled out the possibility of a finding that the manner in which the longshoremen performed their duties resulted in an unseaworthy condition."

We are frank to admit that we do not understand *Venable,* but we are not alone. *See, e. g., Grigsby, supra,* at note 45, where the court said: "The unrevealing per curiam opinion of the full court on rehearing en banc, 4 Cir., 1968, 399 F.2d 355, may be the enigma wrapped in mystery." We therefore will define the terms as we think the Fourth Circuit may intend them to be used.

■ Accordingly, we hold that operational negligence by the stevedore can, but does not necessarily, create an unseaworthy condition, depending on whether such negligence creates a condition where the longshoreman cannot work with reasonable safety. It does not necessarily matter how short a time the unsafe condition existed; once the vessel is not reasonably fit to permit the longshoreman to do his work in reasonable safety then the vessel would be unseaworthy.

Relying on the above standard, we now must determine whether in this case the failure either to use tag lines or to instruct the longshoreman to stand in a safer place as the logs were hoisted was operational negligence which created an unseaworthy condition. On the basis of the existing record, we conclude that no unseaworthy condition was created.

In this case the longshoreman stood at the edge of the gondola car while a log some fifteen to sixteen feet in length, eighteen to twenty-four inches in diameter, and weighing roughly 2,500 pounds was hoisted from the car. The log twisted slightly and the longshoreman was knocked onto the pavement some nine feet below and thereby injured. There was credible testimony by the longshoreman that, prior to the accident, other logs had been twisting as they were lifted, but there is no concrete indication of how much the others had twisted. Nor is there any evidence that standing on the edge of the gondola car should be considered an unreasonably unsafe place to stand. Nor was there any evidence that the gang boss should have instructed Silver to stand elsewhere, or that he did not so instruct him.

If the logs were not twisting enough for any potential risk to be apparent prior to the accident then, at least on the present record, we would find as a fact that the method of loading the logs was reasonably safe.

If the logs were twisting enough to make the risk of being knocked off the car somewhat more obvious (a situation which is not borne out by the evidence), we would still hesitate to say that it would be operational negligence creating a condition where the longshoreman could not work with reasonable safety; either in failing to use tag lines or in failing to instruct an experienced longshoreman to stand in a different position.

■ The warranty of seaworthiness does not guarantee an accident-free ship, but only a vessel reasonably fit for its intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L. Ed.2d 941 (1959).

■ As we have discussed above, tag lines would be needed only if the longshoreman stands where it is reasonably expected that he can be harmed by the twisting. The key to Silver's injury in this case is not that tag lines were not

used, but rather that Silver was standing (perhaps unnecessarily—although the record is not clear) in the path of a twisting log. A question may be raised as to whether he should have been instructed to stand elsewhere.

We know of no cases requiring the stevedore as a matter of law to instruct an experienced longshoreman to stand out of harm's *obvious* way.[8]

■ If warnings are necessary to make a vessel a reasonably safe place to work, then they must be given. Anderson v. Lorentzen, 160 F.2d 173 (2 Cir., 1947). But if whatever danger exists is so obvious that a warning (or instructions to avoid it) would be superfluous, then a warning may not be reasonably necessary. For example, it is unnecessary to say to each man who boards the vessel, "Don't fall overboard," or to each experienced man who loads logs, "Be careful and be sure to stay out of the way when they are hoisted." Accord: Palermo v. Luckenbach Steamship Company, 246 F.2d 557, 560 (2 Cir., 1957), rev'd on other grounds, 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3 (1957). 65 C.J.S. Negligence § 89a.

In reaching this conclusion we are not unmindful of the fact that the longshoreman does not assume the risk of unseaworthiness. Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4 Cir., 1963). We also recognize that the owner may be liable for the creation of an unseaworthy condition even if its creation was the longshoreman's fault. Holley v. The Manfred Stansfield, 186 F.Supp. 212 (E.D.V.A., 1960).

We conclude that the vessel was not unseaworthy at the time and place in question, either under the operational negligence test or otherwise, and that,

on the basis of this record, there was no negligence attributable to the shipowner.

A judgment order will be entered upon presentation.

of loose dunnage being kicked loose by the automobile's spinning wheels—to be created in the first place.

In Blassingill, supra, note 4, the plaintiff was specifically ordered to overload a sling, thereby creating an unsafe condition.

8. In Mendoza, supra, note 3, the court did not place its findings of unseaworthiness on the failure of the gang boss to warn the plaintiff of the danger or to instruct him to stand elsewhere. Rather the court found operational negligence in allowing the unsafe condition—the danger