Anne R. SWORDS, as Administratrix of
the Estate of Robert L. Swords,
Deceased, Appellee,

v.

AMERICAN SEALANES, INC.,
Appellant.

No. 15155.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1971.

Decided June 4, 1971.

Butzner, Circuit Judge, dissented
and filed opinion.

Charles F. Tucker, Norfolk, Va. (J. Davis Reed, III, and Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant.

C. Arthur Rutter, Jr., Norfolk, Va. (Stuart V. Carter, and Breit, Rutter, Cohen, Ermlich, & Friedman, Norfolk, Va., on brief), for appellee.

Before BOREMAN, BRYAN and BUTZNER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Pleading unseaworthiness of the SS American Pride and her master's negligence, crewman Robert L. Swords' administratrix declared against the shipowner, American Sealanes, Inc., for death damages under the Jones Act, 46 USC 688. Swords had drowned February 25, 1969, in the China Sea. A general verdict on the two counts went for the plaintiff in the amount of $100,000.-00. The vessel's owner now asks for a new trial, and we grant it.

Appellant protests the failure of the facts as a matter of law to support either cause of action. The testimony was without discord and revealed the following episode. With Swords aboard as an able-bodied seaman, the American Pride left Okinawa on Sunday, February 23, 1969, bound for Sasebo, Japan. Swords had been drinking heavily during the several days the ship was in port, and was still inebriated when he rejoined the vessel just before she set sail. He was observed carrying whiskey aboard and indulging on ship.

Apparently because of his intemperance, he did not stand evening watch on Sunday, nor on Monday. The first he

stood after departing Okinawa was Tuesday, February 25.

That morning he was called for the 4 to 6 watch at 3:30 o'clock, when he was seen sitting on the side of his bunk. Shortly thereafter Swords was observed in the messroom drinking coffee. To the shipmate who had called him, he seemed sick. He was asked "if he felt like standing watch and he said yes, he would try it". Later, when this same witness saw him in the mess he "looked a little sick, but he was up". His hand shook as he drank the coffee.

About 4 A.M. Swords sought the baker in the galley "to go to work", apparently meaning to make him coffee. Swords spoke of the latter's gaming loss of $30, commenting that it was "not too bad". The baker thought he "looked like he did every morning". Acknowledging the baker's caution to dress in heavy clothes because of the cold outside, he replied, "I am, don't worry," and left for his watch.

That was the last seen of him. He was not authorized to leave his watch station in the starboard bow of the ship unless relieved by a standby. His flashlight and gloves were later found in the seat provided for him.

Along the edge of the deck at this location was a solid metal bulwark about 4 feet in height running from the bow sternward for approximately 30 feet. Adjoining and extending aft for another 30 feet was a guardrail some 3 feet high composed of 3 horizontal chains supported by upright stanchions set into the deck. There was, however, a defect in this guardrail caused by one or more dislocated stanchions which had become separated from the deck. This allowed the chains to dip at one spot to an estimated height of 16 inches above the deck. The passageway bordered by the railing was 8 feet wide, with the deck sloping gradually seaward.

The unseaworthiness alleged by the plaintiff is laid to the sagging railing. The contention is that Swords fell over the side because of this break in the protection.

Report of Swords' disappearance was sent to the bridge at about 6:35 A.M., February 25. A thorough search of the ship followed. Beginning at 7 A.M. the vessel retraced her course several times, scouring the sea for Swords until 3 o'clock in the afternoon. An urgency message of a man overboard had been radioed at 7:38 A.M. to the ships in the area and to Japan's Coast Guard. Swords' body was found in the water by the Japanese several weeks later.

From these facts negligence also is imputed to the shipowner. First, it is said that the master was negligent in allowing Swords to go on watch in the deteriorated physical condition due to his dissipation. It is charged in addition that the master was neglectful in not broadcasting the tragedy earlier, and in failing to post a lookout on the mast during the search for the seaman.

■ I. Guided by the prescriptions of Chicago, Milwaukee & St. Paul Railway Company v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041 (1926), our judgment is that when the facts, and the conclusions which a jury might fairly draw from them, are taken most strongly against the shipowner, the plaintiff's contention that the slack in the chain accounted for or contributed to Swords' death is "without any substantial support. The record leaves the matter in the realm of speculation and conjecture", at 478, 46 S.Ct. at 566. This is not enough to justify submission of the issue of causative unseaworthiness to the jury.

Because of the vast difference in its circumstances, Schulz v. Pennsylvania R. Co., 350 U.S. 523, 76 S.Ct. 608, 100 L. Ed. 668 (1956), cited to us, is not actually precedent contra. There the decedent had been required to tend, on a bitter cold night, four tugboats docked side by side. Three were unlighted and one only slightly illuminated, although their decks were partly iced. His body was

found several weeks later in the water near the boats. The Court pointed to the fair inference that these conditions proximately caused the accident and that the defendant was derelict in requiring the decedent to work in such conditions. Therefore, it refused direction of a verdict for the defendant.

Likewise, Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), rested on facts fully giving rise to an inference of proximate cause. The body of the switch-tender, for whose death the action was brought, was found near the railroad tracks. The proof was that his duties required him to traverse the rails at intervals, with his safety imperilled by train movements. No one witnessed his death, but this testimony was held to supply a premise for the inference that carelessness in the railway activity was the proximate cause of the accident. No such threatening hazard is shown as joining Swords' demise and the lowered railing.

Closer to the present issue is Mosley v. Cia. Mar. Adra, S. A., 314 F.2d 223, 227 (2 Cir. 1963). The Court found that the question of the ship's negligence in failing to provide a longshoreman with a safe place to stand was properly submitted to the jury. However, the Court declined to sustain a submission to the jury of unseaworthiness based upon a defective cargo hook. While explaining that faulty equipment may constitute unseaworthiness, the Court noted the absence of any proof that the condition or fitness of the hook caused or contributed to the plaintiff's injury.

On the same theory, a directed verdict for the defendant was affirmed in Miller v. Farrell Lines, Inc., 247 F.2d 503, 506 (2 Cir. 1957), where suit had been brought to recover damages under the Jones Act for the loss of decedent overboard. The Court found that the plaintiff failed to introduce evidence of any probative facts to demonstrate that defendant's negligence proximately occasioned the loss of life. Therefore, sub-mission to the jury would have been an invitation for indulgence in a series of legally improper speculations.

Conclusive instantly is our decision in Sadler v. Pennsylvania R. Co., 159 F.2d 784 (4 Cir. 1947). A cook on the defendant's barge drowned at night. At the time, the barge was tied to a pier alongside another barge owned by the same defendant. "There was evidence that the guard rails surrounding [the barge] were rotten and broken in places" and were inadequately lighted, at 785. The theory of the plaintiff was that the decedent, in crossing from barge to barge, the boats having drifted almost together, had fallen into the water because, among other things, "of the defective condition of the guard rails", Id. The Court declared that this evidence was not sufficient "to take the case to the jury," at 786. Swords' case is no stronger.

■ II. On the other hand, we think the evidence was sufficient to permit the jury to consider the charges of negligence previously enumerated and find for the plaintiff. However, since there was a general verdict on the two counts, it is not possible to say on which the jury found its verdict. If on unseaworthiness, it cannot stand; if on negligence, it can. Consequently, we must order a new trial of the case on the issue of negligence. See Mosley v. Cia. Mar. Adra, S. A., supra, 314 F.2d 223, 229 (2 Cir. 1963); Vandercook and Son, Inc. v. Thorpe, 344 F.2d 930, 931 (5 Cir. 1965).

Reversed and remanded.

BUTZNER, Circuit Judge (dissenting):

I believe the district judge properly denied the shipowner's motion to set aside the verdict for the plaintiff. At a point not more than twenty steps away from Swords' station, the guardrail of the ship admittedly was defective, a condition which would warrant a jury in finding unseaworthiness. More important, on the question of causation the

evidence showed that the chains sagged to 16 inches above the deck—less than the height of a man's knee. Such an obstacle could easily trip a seaman stirring about his station to keep alert on a dark, cold night. The scope of our review, as stated in Rogers v. Missouri, Pac. R. Co., 352 U.S. 500, 507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957), "is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death." Though here we deal with unseaworthiness instead of negligence, our inquiry may go no further than whether the jury could conclude with reason that the defective guardrail played any part at all in Swords' falling overboard. The cause of death under circumstances no less bizarre has been held a jury issue in both Jones Act cases, see e. g., Pollard v. Seas Shipping Co., Inc., 146 F.2d 875 (2d Cir. 1945), and FELA cases, see e.g., Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916 (1946).

Sadler v. Pennsylvania R. Co., 159 F.2d 784 (4th Cir. 1947), is not to the contrary, for there we were concerned only with negligence, not causation. Without elaborating, we held that "the evidence of negligence with respect * * * to the condition of the guardrails" was insufficient to take the case to the jury. 159 F.2d at 786. But as to the cause of drowning, we said:

> "There is nothing to indicate that he was shoved or pushed overboard, or that he was intoxicated, or that he was attempting to commit suicide. Under such circumstances the cause of the fall can no more be said to be speculative than in the case of a man found in the hold of a vessel beneath an unguarded hatch. See Johnson v. Griffiths S. S. Co. 9 Cir., 150 F.2d 224. It is the duty of the vessel to provide a safe working place for members of its crew; and where there is evidence that it failed to do so and proof of circumstances from which it can reasonably be inferred that injury

resulted from such failure, the case is for the jury. It is elementary that proximate cause need not be established by direct evidence but may be proven by circumstances." 159 F.2d at 786.