**Frances KIESEL, as Administratrix of the Goods, Chattels and Credits of James Franklin Kiesel, Deceased**

v.

**AMERICAN TRADING AND PRODUCTION CORPORATION.**

Civ. No. 21002–M.

United States District Court,
D. Maryland.

July 31, 1972.

---

5. Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' and Exhibitors' Association, 393 F.2d 75, 77.

John J. O'Connor, Jr., and O'Connor & Preston, Baltimore, Md., and Harvey Goldstein, New York City, for plaintiff.

Robert H. Williams, Jr., Donald A. Krach, and Niles, Barton & Wilmer, Baltimore, Md., for defendant.

JAMES R. MILLER, Jr., District Judge.

## MEMORANDUM OPINION AND ORDER

This is a suit under the Jones Act, 46 U.S.C. § 688, and the General Maritime Law by the administratrix of a deceased seaman, James Franklin Kiesel, against the owner of the SS MARYLAND TRADER aboard which decedent was employed as a second assistant engineer when he disappeared from the ship on December 6, 1968. The amended complaint seeks damages for the pain and suffering and mental anguish allegedly sustained by the decedent prior to his death in the first count and seeks damages sustained by his widow and dependent children as a result of his alleged wrongful death in the second count.

By agreement of the parties, the trial was conducted by the court sitting without a jury.

Decedent (Kiesel) had worked for the defendant as a seaman since approximately 1955. He had a license as a third assistant engineer but, under a waiver issued by the Coast Guard, had been sailing as a second assistant engineer continuously since June 6, 1966, except for periods when he was on leave. Kiesel first sailed on the SS MARYLAND TRADER in November, 1963 and had made several voyages on her thereafter.

On December 4, 1968, Kiesel joined the SS MARYLAND TRADER while she was moored at Swan Island on the Willamette River in or near Portland, Oregon. Preparatory to making a shift of berth of the MARYLAND TRADER from Swan Island to the grain elevators at Kalama, orders were given the engine room on December 6, 1968 to stand by the engines at 1554 hours (3:54 p. m.). Kalama is downstream and approximately 30 miles from Swan Island and is on the Columbia River below its confluence with the Willamette River. Shortly before 1600 hours, Kiesel entered the engine room and then assumed his station in charge of the adjacent boiler room. At 1618 hours the ship took in its last line and started to back into the Willamette River with the aid of two tugs.

At approximately 1700 hours, the third assistant engineer, Werner, relieved Kiesel in the boiler room in order that Kiesel could go to dinner. The chief mate, Balboni, was in the officer's dining salon when Kiesel came in for dinner. Kiesel ordered a fish dinner. When his dinner came, he remarked to Balboni and Miller, another engineering officer who was then in the salon, that he did not like the fish. Between approximately 1710 and 1712, Kiesel abruptly left the salon without having finished his dinner. He was not seen alive again.

At approximately 1715 hours the chief engineer, Hempelman, was relieved of his

duties in the engine room to eat dinner. At 1735 he returned to the engine room from dinner. Hempelman walked from the engine room to the boiler room and saw that Werner, whom Kiesel was supposed to have relieved for dinner, was still there. Hempelman told Werner to go up and get Kiesel so that Werner could eat. Werner assumed that Kiesel was in the dining salon. When he found that Kiesel was not there, Werner returned to the engine room and told Hempelman. Hempelman then told Werner to check in Kiesel's room to see if he was there. Werner went to Kiesel's room and bathroom and found Kiesel was not in either place. On his way back to the engine room, Werner went into the dining salon and inquired of the messman if he had seen Kiesel to which the messman replied that Kiesel had been there and had gone. Without determining how long ago Kiesel had been in the dining salon, Werner assumed that he was probably now down in the boiler room and decided to order his own food for the evening meal. While it is not clear whether or not Werner started to eat his food, within a minute or so after arriving in the dining salon Werner decided that he had better check to see if Kiesel was in the boiler room. He went to some grating on the deck through which he could look down into the boiler room three decks below and did not see Kiesel. Werner then went back to the engine room to tell Hempelman that he had checked Kiesel's room and bathroom as well as the salon again and could not find him. When Werner returned to the engine room, it was approximately 1750 hours. Hempelman immediately called the captain, Captain Corazza, told him that he could not locate Kiesel and asked the captain if he knew where Kiesel was. Balboni was on the bridge with Captain Corazza when Hempelman's phone call was made to the captain. During the call, the captain was advised that Kiesel had not shown up to relieve Werner in the boiler room, that Kiesel was not in his room or the bathroom, and that he had last been seen leaving the officer's dining salon at approximately 1712 hours. The court believes, and finds as a fact, that the conversation between Hempelman and the captain ended at approximately 1755 hours. During the conversation a decision was made to expand the search aboard the ship for Kiesel.

The captain himself, Werner, and several other licensed officers searched various parts of the vessel where it was likely that Kiesel might be.

Not having found Kiesel at 1805 hours, the captain asked the river pilot, Johnson, who was on board for the purpose of guiding the vessel down the channel, what the approximate location of the vessel would have been at 1712 hours and how to contact the Coast Guard. Using the information given to him by the pilot, the captain called the Coast Guard at Portland, and reported that Kiesel was apparently missing from the vessel and that he had last been seen at 1712 hours at approximately the Willamette River Light No. 6. At approximately 1816 hours the Coast Guard requested the speed of the vessel at 1712 which was given as 7½ knots. In addition, the Coast Guard was told at that time of Kiesel's physical description and of the clothes that he was wearing when last seen. Shortly after 1805 hours the pilot on his portable walkie-talkie called a tug which he had remembered seeing near the mouth of the Willamette and advised her that a man was missing from the ship who had last been seen in the vicinity of Willamette Light No. 6. The tug was asked to be on the lookout and she responded that she would look around as she went through that area. At 1837 the Coast Guard notified Captain Corazza that a helicopter search had commenced and that a boat search had previously been instituted. At 1900 hours the Coast Guard Westport radio station was asked to contact vessels in the vicinity and area hospitals in an effort to locate Kiesel.

In the meantime, searches were continuing on the ship in ever increasing intensity in an effort to locate Kiesel. The ship berthed at Kalama at 1918 and

the search continued on board until 2150 hours. During the search on the vessel, deck plates were removed to search spaces below, cargo tanks were searched, and all spaces generally in the vessel which could have contained a man, including the lifeboats, were examined in a fruitless effort to find Kiesel.

On June 19, 1969, Kiesel's body was found floating in Multnomah Channel, a body of water whose mouth is approximately 3½ miles upstream on the Willamette River from the confluence of the Willamette and Columbia Rivers. An autopsy revealed no physical signs of traumatic antemortem injury and cause of death was determined to be asphyxiation by submersion (drowning).

When a vessel is shifting from one inland berth to another, the universal practice is to flake the mooring lines on deck rather than stow them below, in order that the lines will be readily available when needed to tie up to the dock at the new berth. Normally the lines are flaked on the side of the vessel which was adjacent to the dock from which the vessel is departing unless it is known ahead of time that the vessel will dock on the other side, in which event the lines are moved to that side. In this case, the starboard springline, about 600 feet in length, was flaked along the after outer starboard passageway under the direction of Balboni when the MARYLAND TRADER left Swan Island.

The mooring lines were of a synthetic material and had a circumference of approximately eight inches. Balboni testified that there were four flakes in the springline which would make each flake approximately 75 feet in length. The drawing of the ship in evidence shows that the aft starboard springline bit was 33 feet aft of the thwartships passageway starboard door (hereinafter called the door) of the afterhouse. The aft starboard springline chock is 20 feet aft of the door. The starboard sternline bits are approximately 22 feet aft of the aft starboard springline bits. It is apparent, therefore, that a starboard springline 600 feet in length, flaked into four flakes of approximately 75 feet each along the outer starboard passageway, would extend forward beyond the door even if the flakes began 10 feet or so aft of the aft starboard springline bits. This was the customary place for the springline to be flaked. The lines were flaked on the outboard side of the after outer starboard passageway and took up about one foot of the width of the passageway leaving approximately 3½ feet of unobstructed passageway. The height of the flaked lines above the deck was approximately 3½ inches.

The door leads from the outboard starboard passageway on the poop deck to a starboard thwartships passageway of the afterhouse which in turn leads to a short passageway of several feet leading into the officer's dining salon. The door is a large metal watertight door with a sill approximately 14 inches high from the deck of the passageway. Along the entire outboard edge of the outer starboard passageway on the poop deck is a three-rail metal safety railing with the highest railing 43 inches above the deck. The interior thwartship passageway is well lit. The outboard starboard passageway has dim lights spaced at intervals along it. The light closest to the door on the outboard starboard passageway was approximately 12 to 15 feet aft of the door.

No sign or other warning was affixed to the interior of the door or any other position indicating that the springline was flaked along the outer starboard passageway.

The plaintiff urges two theories upon which liability of the defendant should be established. The first theory is that the ship was unseaworthy and that there was negligence on the part of the defendant and its agents in the placement of the springline in the area of the door leading to the outer starboard passageway on the poop deck and that Kiesel, unaware of the presence of the lines, and blinded from going from the well-lit interior passageway to the outer passageway at night, perhaps while rushing to the rail to vomit the dinner which he did

not like, tripped over the springline and fell into the Willamette River.

All of the licensed officers who testified in this case agreed that the universal practice when shifting from berth to berth on inland waters was to flake the mooring lines on deck in an area where they would be readily available for their intended use when docking. No witness testified that he had ever seen a starboard springline flaked in any location other than the outboard starboard passageway. The testimony by Captain Paul Hyatt, an expert called on behalf of the defendant and a master of ships on inland waters since 1931, was that the lines are flaked in order to be ready for immediate use when needed for docking at the new berth and that it would take about an hour to stow below and unstow a starboard springline with about five men doing the stowing work which had a greater potential for hazard to themselves than if the line was merely flaked.

Balboni was the only person who testified that flaking the lines forward of the thwartships passageway door was an improper or unseamanlike action. Balboni, however, did not testify that he had ever flaked a starboard springline in any different fashion than he ordered the one in this case flaked. His testimony that the practice was unsafe seems to be based solely on his assumption that Kiesel tripped over the line in this instance and fell overboard.

Captain Hyatt testified that the line in front of the door is not unusual and, on the contrary, is standard procedure on the inland waters shift of berth. He further testified that in his many years at sea, he had never seen any sign in use to warn that lines are flaked on the passageway and he expressed his expert opinion that no such sign is required for safe practice aboard a ship with an experienced crew.

It was also recognized by all the witnesses who addressed themselves to the subject that lights on ships on outboard passageways are dim in order that they will not confuse other ships as running lights and that the eyes of seamen on the passageways will not lose their accommodation to the darkness.

■■ While this court is aware that a trade custom is not a measure of negligence or seaworthiness, The T. J. Hooper, 60 F.2d 737 (2d Cir. 1932); Silver v. American Export Isbrandtsen Lines, Inc., 310 F.Supp. 681 (E.D.Va.1970), evidence of prevailing industry standards may be considered as some evidence that the ship was not unseaworthy and that the defendant was not negligent in connection with the flaking of the springlines and the lighting in the area of the thwartships doorway. Bryant v. Partenreederei-Ernest Rus, 330 F.2d 185 at 189 (4th Cir. 1964); Burgess v. Farrell Lines, Inc., 335 F.2d 885 at 890 (4th Cir. 1964); Cia Maritima Del Ner Vion v. James J. Flanagan Shipping Corp., 308 F.2d 120 at 123 (5th Cir. 1962).

■ The mere fact that an accident occurs on a ship does not indicate a breach of the shipowner's duty. "[T]he shipowner's duty to furnish a seaworthy ship is not a duty to furnish an accident-free ship; 'it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use.' Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 [80 S.Ct. 926, 933, 4 L.Ed.2d 941] (1960). Thus, the concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223, 227 (2d Cir. 1963).

■■ In this case, the reasons for the flaking of the lines in the manner in which they are universally flaked under similar circumstances and for the lighting intensity on the outer starboard passageway are self-evident and convince this court as a fact that such conditions did not render the ship unseaworthy nor constitute negligence attributable to the shipowner. Neither was it necessary to give a warning that the lines were flaked along the starboard passageway or a warning that the light was dim on the

starboard passageway in order to make the vessel a reasonably safe place to work. Although a seaman does not assume the risk of unseaworthiness, Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939), if whatever danger exists is so obvious that a warning, or instructions to avoid it, would be superfluous, then a warning may not be reasonably necessary. On the evidence in this case, the court finds as a fact that any experienced seaman would know that lines are flaked on deck during a shift on inland waters and that the lighting on outboard passageways is dim. The evidence is that no warning is customarily given of these constantly recurring conditions and this court finds that none is required.

 Even if there were negligence or unseaworthiness, this court, as the factfinder, cannot find that the plaintiff has met her burden of showing that the unseaworthy condition or the conditions created by the alleged negligence had a proximate causal relationship with the death of Kiesel. While, as the Supreme Court has said, "fact finding does not require mathematical certainty," Schulz v. Pennsylvania R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956), and while in a case such as this the issue on causation is whether or not the negligence or unseaworthiness played any part at all, however slight, in the death of Kiesel, Butler v. Whiteman, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958); Rogers v. Missouri, Pac. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); Schulz v. Pennsylvania R. Co., *supra;* see also Barboza v. Texaco, Inc., 434 F. 2d 121 (1st Cir. 1970); Pollard v. Seas Shipping Co., 146 F.2d 875 (2d Cir. 1945); cf. Swords v. American Sealanes, Inc., 443 F.2d 1324 (4th Cir. 1971); Smith v. Reinauer Oil Transport, 256 F. 2d 646 (1st Cir. 1958); Miller v. Farrell Lines, 247 F.2d 503 (2d Cir. 1957), this court cannot find as a fact that there was any connection between the flaked lines along the starboard passageway and the disappearance of Kiesel overboard.

There was evidence that Kiesel had been released from a sanitarium on December 3, 1968, at 5 p. m., where he had been treated for excessive drinking and that his wife did not want him to go to join the MARYLAND TRADER at Portland, Oregon on December 4, 1968, because she did not think that he was ready physically. Kiesel had a history of excessive episodic drinking and had been diagnosed as an alcoholic. He had been hospitalized on a number of occasions for withdrawal symptoms and in order to build him up physically again after prolonged episodes of drinking during which he suffered from a vitamin deficiency. During a hospitalization in 1959, he had threatened suicide and he generally suffered from anxiety and depression when withdrawing from an alcoholic bout. Although he was not drinking on board ship and did not seem to his shipmates to be depressed, it seems as probable to this court that in his weakened physical condition he passed out or became dizzy while on deck and fell overboard or that he deliberately jumped overboard as it is that while walking out of or running out of the thwartship passageway door he tripped on or over the flaked starboard springline and fell overboard. The court finds that the plaintiff has not established that the alleged unseaworthiness or the alleged negligence was a proximate cause of the death of Kiesel.

The second theory of liability of the defendant urged by the plaintiff is that the captain of the MARYLAND TRADER violated his duty on behalf of the shipowner to exert all reasonable efforts to rescue Kiesel who had gone overboard.

 It is beyond dispute in this circuit that " . . . the admiralty law annexes to a seaman's contract of employment an obligation on the part of the master to use every reasonable means to save the seaman's life if he goes overboard. Harris v. Pennsylvania R. R., 50 F.2d 866 (4th Cir. 1931)." Gardner v. National Bulk Carriers, Inc., 310 F.2d 284 at 286 (4th Cir. 1962), cert. denied

372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963).

The plaintiff does not argue that the ship was unseaworthy in any respect by not having the proper safety equipment on board or by having defective safety equipment. Indeed it would be difficult to make any such argument since the evidence was that the ship had just passed a Coast Guard safety inspection at the shipyard on Swan Island on the very day that Kiesel disappeared. Plaintiff does argue, however, that Captain Corazza should have turned the MARYLAND TRADER around in the Columbia River and returned to the Willamette River where, it is argued, he should have put out a boat or boats and played searchlights on the water and generally assisted in the rescue effort.

The evidence showed that the MARYLAND TRADER is a "jumboized" T–2 tanker, 572 feet long and 75 feet wide. The ship has a length at the waterline of approximately 567½ feet. Its draft at the time in issue was approximately 2 feet forward and approximately 16 feet 6 inches aft. The ship has a single propeller and a bow anchor only. It had a motorized lifeboat in good working order and a powerful signal light which could be used as a searchlight.

The fact that Kiesel's body was found in the Multnomah Channel upstream from the confluence of the Willamette and Columbia Rivers means that Kiesel went into the water while the MARYLAND TRADER was still in the Willamette River. Even though there are spring freshets which occasionally reverse the current, Johnson, the river pilot, testified that the freshets could not have brought Kiesel's body back to Multnomah Channel in the area in which it was located if the body had originally been in the Columbia River.

The evidence showed that the current on December 6, 1968, was approximately 2.1 knots downstream. The water was calm. The water temperature was approximately 41 degrees at Swan Island. The channel in the Columbia River was deeper than usual because of a high tide and had a minimum depth of 45 to 50 feet. The Columbia River channel is approximately 600 feet wide and comes under the "narrow channel rule" of appropriate Coast Guard regulations. At various places along the Columbia River, jettys protrude out of the channel. About two-thirds of the jettys between the mouth of the Willamette River and Kalama are unlighted.

In the area of the Columbia River and the Willamette River, most of the ship movements are at night, approximately 60 percent of the work of area river pilots being at night. A river pilot in Oregon must be licensed by the Oregon State Board of Pilots. He has the responsibility of advising the captain of a ship concerning local conditions.

The log shows that the ship entered the Columbia River at approximately 1719 hours. Since Kiesel had to have entered the water before the ship reached the Columbia River, and since he was seen on the ship at approximately 1712 hours, he must have entered the waters of the Willamette River between approximately 1712 and 1719 hours.

When Captain Corazza was notified at approximately 1755 hours that Kiesel could not be located, the ship was moving at full ahead, a speed of at least 14½ knots considering the current. At 1755 hours, the approximate position of the ship was midway in the Henrici Range, about eight miles downstream from the mouth of the Willamette. The expert witnesses agreed that it would have taken approximately a mile and one-half to get the way off the vessel, recognizing, of course, that the current would still be moving at two knots over the bottom. Donald Hughes, president of the Columbia River Pilots Association, a man who is thoroughly familiar with the conditions of the Willamette and Columbia Rivers and who has piloted jumboized T–2 tankers on many occasions, testified that even if Captain Corazza had begun to stop the MARYLAND TRADER at 1755, he would not have been able to get her way off until

she had reached Duck Club Light. Both Mr. Hughes, and Mr. Johnson, the river pilot who was on the ship on the night in question, testified that Duck Club Light is not an area of the Columbia River in which it is feasibly safe to turn a ship the size of the MARYLAND TRADER without the aid of a tug. Captain Rynbergen, an expert who testified for the plaintiff, admitted that it would become " . . . less advisable" to turn the ship at or downstream of Duck Club Buoy. Captain Rynbergen further admitted that he had no personal knowledge of the currents and eddys on either the Willamette or Columbia Rivers, that he would have depended upon the judgment of the pilot, that he had never sailed on a jumboized T-2 tanker, that he did not know the tonnage of such a ship, and that he had no knowledge of the speed or turning tables of the MARYLAND TRADER.

Mr. Johnson and Mr. Hughes, the two Columbia River pilots, both testified that the next point below Duck Club Light at which it would be feasible to turn the ship around would have been an area of the river known as Saint Helens Turn. It is approximately 12½ miles from this point to the mouth of the Willamette River.

From the conflicting evidence the court finds that Saint Helens Turn would have been the first area in the river in which it would have been reasonably feasible to turn the ship around.

Taking into consideration the conflicting estimates of the various experts, the court finds as a fact that it would have taken 10 minutes for the ship to reach the point at which it could begin to perform a back and fill operation to become dead in the water, an additional one-half hour to stop, another one-half hour to perform the turning operation and return the engine to full-ahead speed, and an additional one hour and five minutes to return to Kelly Point at the mouth of the Willamette River. This would have put the ship at that point at 2010 hours assuming, for the sake of discussion, that Captain Corazza had

decided at 1755 hours to turn the ship around at the next reasonably safe point in the river. It would have taken an additional eight minutes to reach Willamette Light No. 6. Due to the restriction of the river channel in the area, it would have made no difference in the time it would have taken the ship to return to Willamette Light No. 6 whether the captain determined to turn the ship around at 1755 hours when he received the call from Hempelman or 1805 hours when he had completed his own search, since the ship could not have safely turned in any event until it reached Saint Helens Turn.

Any turning operation of a ship the size of the MARYLAND TRADER in the Columbia River at night without the aid of a tug or tugs would have been at best a risky operation. Mr. Hughes said that "in the Columbia River, you don't have a chance to make a mistake." Since the ship was light, approximately five feet of its propeller was above water, thereby reducing backing power. If the ship had run aground, and swung crossways to the channel, it would have blocked the channel creating an extreme hazard to navigation. Weighed against the risks of attempting to turn the vessel was the fact that the ship could not possibly have returned to the area in which Kiesel was last seen until over an hour after Coast Guard vessels were already on the scene searching. A ship the size of the MARYLAND TRADER would have been of no effective use itself in a search in a constricted area such as the Willamette River, although its motorized lifeboat could have conceivably been of some assistance once the MARYLAND TRADER reached the scene to launch it.

By the time the MARYLAND TRADER could have reached the mouth of the Willamette River, however, Kiesel was already dead. The water temperature was 41 degrees Fahrenheit. The evidence established to the satisfaction of this court that scientific studies have demonstrated that 100% of persons immersed in water of that temperature in

plain clothing and provided some means of flotation other than their own effort become unconscious and thus drown within two hours and 10 minutes of their immersion. In water of that temperature, the time at which 100% expectancy of death would occur would be less for those persons, such as Kiesel, who had no means of staying afloat other than their own swimming efforts. Since Kiesel necessarily entered the water prior to 1719, he would surely have been dead by 2010 hours. Any attempt of the ship to return to the scene would, under the circumstances, have been futile and could have had no effect upon Kiesel's chances of survival.

No case has been found or cited which mandates liability of the ship under these circumstances. In Gardner v. National Bulk Carriers, Inc., *supra*, at 288, the court said:

"We do not imply that in every case immediately upon word of a seaman's absence from his watch all progress of the ship must be halted and the ship reversed for rescue operations while a search is made aboard for the seaman. It is realized that the master is called upon to make his decision on the basis of uncertain fact.

"We hold that the burden of the risk involved in the master's inaction must be cast by the law on him and the ship, and not on the helpless man in the water. . . . The grave obligation of rescue is not to be satisfied merely by a search of the vessel. A master who abandons a missing seaman *while there is yet a reasonable opportunity to save him*, acts at his own risk." (Emphasis supplied).

In *Gardner*, the ship was on the ocean and there was no danger or risk whatsoever in turning the ship about. Furthermore, there is no evidence that in *Gardner* the sea temperature precluded the survival in the water of the missing seaman.

The above quoted language of *Gardner* clearly indicates that liability is not fixed ipso facto to a ship merely because the master does not turn the ship around when it is determined that a man is missing. Here the master called the Coast Guard and advised it of Kiesel's disappearance and the possibility that he was overboard within 10 to 15 minutes after he had been notified by Hempelman that Kiesel could not be found. It was not unreasonable for Captain Corazza to search himself for 10 or 15 minutes in other areas of the ship which had not previously been searched before calling the Coast Guard. Cf. Ferro v. United States Lines Co., 74 F.Supp. 250 (S.D.N.Y.1947). Having promptly and diligently called the Coast Guard and given the ship's location when Kiesel was last seen, Captain Corazza was not required by the law to risk his ship and those on her, as well as the safety of other vessels and men then on the river, to attempt to reverse his course to return to the area where Kiesel was last seen when, due to the water temperature, Kiesel would have been dead from exposure or drowning before the ship could reasonably have returned, particularly in view of the fact that Coast Guard rescue vessels and a helicopter would have been on the scene long before the MARYLAND TRADER could have reached it.

Lest it be thought that I have overlooked it, caution requires me to state that I find as a fact that the time between 1735, when Kiesel was first missed, and 1805, when Captain Corazza prepared to call the Coast Guard, was not an unreasonable length of time for, first, the chief engineer to conduct a search under his authority and, second, the captain to conduct a search under his superior authority before the conclusion was reached that there was sufficient evidence that Kiesel might have fallen or otherwise have gone overboard to justify giving a "man overboard" call to the Coast Guard. As Balboni, Kiesel's friend, said:

"I could not bring myself to believe he wasn't there. He was a friend of mine. I could not bring myself to believe that he was over the side. I was hoping to find him. I went through the afthouse. I did not tell

the engineers. I did not want to hurt their feelings. I looked inside the tanks, the poop deck and all around." (Balboni deposition, p. 67).

It is not surprising that 30 minutes were consumed in the search of a ship the size of the MARYLAND TRADER in order for the master and chief engineer to reach the conclusion that an experienced engineering officer might have gone overboard during a shift of berth in inland waters on a calm night.

For the above reasons, the court finds that the plaintiff has not established that the captain or other officers or men of the MARYLAND TRADER violated their duty on behalf of the shipowner to exert all reasonable efforts to rescue Kiesel.

This opinion shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52, F.R. Civ.P.

Judgment will be entered in favor of the defendant for costs.